1                                                                    **WO**

2

3

4

5               **IN THE UNITED STATES DISTRICT COURT**

6                  **FOR THE DISTRICT OF ARIZONA**

7

8   Larissa Waln, Bryan Waln,                    No. CV 20-00799 PHX CDB

9                    Plaintiffs,                  **ORDER**

10  v.

11  Dysart School District, et al.,

12                   Defendants.

13

14        **I.      Introduction**

15        Plaintiffs Larissa Waln and her father Bryan Waln are both enrolled tribal members

16  of Sioux Nations, respectively the Sisseton Wahpeton Oyate and Rosebud Sioux. The

17  Walns' religion, culture, and heritage are central to the issues in the instant case. Larissa

18  Waln graduated from Dysart School District's Valley Vista High School in May of 2019.

19  This action, brought pursuant to 42 U.S.C. § 1983, arises from the denial of Larissa's

20  request to attend the 2019 graduation ceremony wearing a beaded cap crowned with an

21  eagle feather in accordance with her beliefs. Plaintiffs charge Defendants with violating

22  Larissa's First Amendment rights to free speech and the free exercise of her religion and

23  her Fourteenth Amendment right to equal protection, and also assert state constitutional

24  and statutory claims. Plaintiffs seek declaratory judgment, unquantified compensatory and

25  punitive damages, and attorneys' fees and costs.[1] (ECF No. 7 at 40-41).

26        _____

27        [1] Although the Amended Complaint does not specify the nature of, or quantify, the
    requested monetary relief, Plaintiffs' Notice of Claim, a prerequisite to asserting the state law-
    based claims, indicates Plaintiffs seek $1 million in damages for violation of Plaintiffs' federal and

28  state constitutional rights, Defendants' asserted violation of the Arizona Free Exercise of Religion
    Act ("FERA") and Arizona Revised Statutes § 15-110(A), and for intentional infliction of

1       Defendants move to dismiss these claims pursuant to Rule 12(b)(6) of the Federal

2   Rules of Civil Procedure. (ECF No. 29). With regard to Plaintiffs' §1983 claims

3   Defendants assert*, inter alia*, that Mr. Waln lacks standing; the Defendant Dysart School

4   District Governing Board members are immune from suit; the Walns name entities not

5   amenable to suit under § 1983; and the Walns fail to sufficiently allege cognizable § 1983

6   claims. Defendants contend the denial of Larissa Waln's request to wear a beaded and

7   adorned cap at graduation, pursuant to a content neutral commencement dress code, did

8   not violate Larissa's federal constitutional rights to free speech, the free exercise of her

9   religion, or equal protection, pursuant to controlling legal precedent.

10      The parties consented to the exercise of magistrate judge jurisdiction over this

11  matter, including the entry of final judgment. (ECF No. 32). The Court does not find that

12  oral argument would assist in deciding Defendants' motion and will, therefore, exercise its

13  discretion to deny Plaintiffs' request for oral argument.

---

14  emotional distress. (ECF No. 37-1 at 6-9). The Notice of Claim cites depression, headaches,

15  trouble sleeping, and "carrying out daily functions" as the bases for damages. (ECF No. 37-1 at 8-
9). Mr. Waln seeks damages for "frustration, disappointment, sadness and physical and emotional

16  symptoms of stress from tirelessly researching and trying to convince the District in a very short

17  period of time that his daughter should be able to wear her cap and eagle plume during graduation."
(ECF No. 37-1 at 6). A plaintiff in a § 1983 suit is entitled to monetary damages only to the extent

18  they produce evidence of actual compensatory damages. *E.g.*, *Carey v. Piphus*, 435 U.S. 247, 263-
64 (1978). If a plaintiff is unable to establish actual compensatory damages and a constitutional

19  violation did occur, the plaintiff is entitled to nominal damages. *E.g.*, *Schneider v. County of San*

20  *Diego*, 285 F.3d 784, 794-95 (9th Cir. 2001); *Floyd v. Laws*, 929 F.2d 1390, 1401 (9th Cir. 1991).
Additionally, if a § 1983 plaintiff is awarded only nominal damages, they may not be entitled to

21  an award of their full attorneys' fees unless they also achieve some "tangible result" from the
litigation, such as the achievement of a public goal. *See Guy v. City of San Diego*, 608 F.3d 582,

22  590 (9th Cir. 2010); *Benton v. Oregon Student Assistance Comm'n*, 421 F. 3d 901, 905-06 (9th

23  Cir. 2005), *citing Farrar v. Hobby*, 506 U.S. 103, 120-21 (1992) (O'Connor, J., concurring).

24      Punitive damages in a §1983 action may be awarded by a jury only for an individual
defendant's intentional violations of the plaintiff's constitutional rights when the defendant is

25  found to have been motivated by an evil motive or when the defendant acted in reckless or callous
disregard for the plaintiff's rights. *See Smith v. Wade*, 461 U.S. 30, 51 (1983); *Dang v. Cross*, 422

26  F.3d 800, 806-07 (9th Cir. 2005). As a matter of law, a public entity such as a school district cannot
be liable under § 1983 for punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S.

27  247, 271 (1981); *Ruvalcaba v. City of L.A.*, 167 F.3d 514, 524 (9th Cir. 1999); *Phipps v. Clark*

28  *Cty. Sch. Dist.*, 164 F. Supp. 3d 1120, 1229 (D. Nev. 2016); *Gay-Straight All. Network v. Visalia Unified Sch. Dist.*, 262 F. Supp. 2d 1088, 1110-11 (E.D. Cal. 2001).

## II.    The Amended Complaint

Plaintiffs' Amended Complaint names as Defendants the Dysart School District (also "Dysart" or "the District"); the Dysart School District Governing Board ("Governing Board"); Pritchard, Leonard, Densmore, Sawyer-Sinkbeil, and Tanner (who were all members of the Governing Board in May of 2019); Dysart School District Superintendent Kellis; Valley Vista High School; Valley Vista High School Principal Lockhart; Valley Vista High School Assistant Principal Larremore; and Valley Vista High School Assistant Principal Pierce. The Governing Board members and Kellis, Lockhart, Larremore, and Pierce are named as defendants in both their official and individual capacities.

The Amended Complaint asserts: (1) a claim against Dysart and the "Individual Defendants"[2] in their individual capacities for violation of Larissa Waln's First Amendment right to the free exercise of her religion; (2) a claim against the "Individual Defendants"[3] in their individual capacities and Dysart for violation of Larissa Waln's First Amendment right to freedom of speech; (3) a claim against the "Individual Defendants"[4] in their individual capacities and Dysart for violation of Larissa Waln's Fourteenth Amendment right to equal protection of the law; (4) a claim against the "Individual Defendants" in their individual capacities and Dysart for violation of both Larissa Waln and Bryan Waln's rights to the free exercise of their religion under the Arizona Constitution

---

[2] The heading of this count states it is against the "Individual Defendants" and elsewhere in this count Plaintiffs state the "discriminatory actions against [Larissa] were taken by officials with final policymaking authority – namely, Dysart Superintendent Quinn Kellis and Governing Board members Pritchard, Leonard, Densmore, Sawyer-Sinkbeil, and Tanner." (ECF No. 1 at 25-26).

[3] The heading of this count states it is against the "Individual Defendants" and within the count reference is made to the "Individual Defendants." In the final paragraph of this count Plaintiffs state: "The Defendant Dysart School District is likewise liable for violating Plaintiffs' free speech rights because discriminatory actions against the Plaintiffs were taken by officials with final policymaking authority – namely, Dysart Superintendent Quinn Kellis and Governing Board members Pritchard, Leonard, Densmore, Sawyer-Sinkbeil, and Tanner." (ECF No. 1 at 29).

[4] Plaintiff assert "each of the named Individual Defendants acted to prevent Plaintiff Larissa Waln from exercising her fundamental constitutional rights." (ECF No. 1 at 30). Elsewhere in this count Plaintiffs again assert the District is liable because discriminatory actions were taken by the Governing Board members. (ECF No. 1 at 31).

and the Arizona Free Exercise of Religion Act ("FERA"); and (5) a claim against the "Individual Defendants" in their individual capacities and Dysart for violation of both Larissa Waln and Bryan Waln's rights to freedom of speech under the Arizona Constitution.[5]

Plaintiffs do not dispute that Defendant Valley Vista High School is not a legal entity that can be sued pursuant to § 1983 (ECF No. 37 at 14) and, accordingly, this defendant must be dismissed for want of jurisdiction. Additionally, Plaintiffs' claim for declaratory relief is moot as Larissa has graduated from Valley Vista High School and is no longer subject to the allegedly unconstitutional dress code. *See Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098, 1099-1100 (9th Cir. 2000) ("It is well-settled that once a student graduates, [s]he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy."); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc), *citing Ceniceros v. Board of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878, 879 n.1 (9th Cir. 1997). Accordingly, Plaintiffs' claim for declaratory relief must be dismissed as moot.

### III.   Factual Background

Plaintiff Larissa Waln graduated from Valley Vista High School ("Valley Vista") in May of 2019 and reached the age of majority prior to filing this action.

---

[5] Plaintiff Bryan Waln may not proceed on § 1983 claims that his own federal constitutional rights were violated because his daughter was not allowed to wear a decorated graduation cap at her commencement ceremony. The Amended Complaint appears to assert Mr. Waln's claims only pursuant to state law. To the extent the Amended Complaint may be read as asserting Defendants are liable to Mr. Waln pursuant to § 1983, the factual allegations that "he was unable to protect his daughter from the actions of the District and its employees" or that he wanted "Larissa to wear her beaded graduation cap and sacred eagle plume . . ." (ECF No. 7 at 23, 35-36) fail to state a cognizable § 1983 claim. None of the factual allegations in the Amended Complaint state a basis for a claim that Mr. Waln's own personal federal constitutional rights to free speech, free expression, or equal protection were violated, and parents do not have any fundamental federal constitutional right to direct a public school with regard to establishing or enforcing a school's policies. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1229-30 (9th Cir. 2020), *cert. denied*, ___ S. Ct. ___, 2020 WL 7132263 (U.S. Dec. 7, 2020) (No. 20-62); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005). *See also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 289-90 (5th Cir. 2001).

Dysart School District rented a large private venue for the May 2019 graduation ceremonies conducted by the four high schools in the District. Approximately 1700 to 2000 graduating students participated in these ceremonies, with their families and friends in attendance.

On April 25, 2019, Valley Vista Principal Lockhart communicated the graduation ceremony dress code through a letter to the graduating students' parents.[6] In the letter Defendant Lockhart stated: "a school medallion and school approved honor cords and stoles may be worn over gown, no other adornment/additions are allowed." (ECF No. 7-2 at 8). The letter further advised that students "may NOT decorate their gown or cap." (*Id.*). The graduation dress code was addressed again during a Valley Vista senior class meeting on May 6, 2019. (ECF No. 7 at 13).

Larissa Waln, who is an enrolled member of the Sisseton Wahpeton Oyate (Sioux), wanted to wear a beaded cap adorned with an eagle plume during the graduation ceremony, for cultural and religious reasons. In anticipation of Larissa's graduation, Bryan Waln, Larissa's father and an enrolled member of the Rosebud Sioux, began "the longstanding cultural and religious practice of intricately beading Larissa's graduation cap to conform to their religious beliefs and tradition. The plume and beaded cap were to be gifted to Larissa to honor her achievement of high school graduation and passage into adulthood." (ECF No. 7 at 3).

---

[6] The parties dispute whether the Dysart School District promulgated a district-wide graduation dress code, or whether each high school established its own graduation dress code. The letters from the District's counsel to the Native American Rights Fund ("NARF") and the American Civil Liberties Union ("ACLU"), which were copied to Plaintiffs, used the term: "The District's commencement dress code." (ECF No. 7-2 at 2; ECF No. 7-4 at 2). The written form of the dress code provided to the Valley Vista High School students and their parents is printed on Valley Vista High School letterhead and signed by Valley Vista High School Principal Lockhart. (ECF No. 7-2 at 8-9). The written dress code stated that "adornments/additions" to graduation gowns would not be allowed and also stated "[s]tudents may NOT decorate their gown or cap." (*Id.*) The dress code also required students to wear "[a]ppropriate dress," such as a shirt and tie or a polo shirt and dress slacks or khakis for men, and a dress or dress pants and a blouse for women, and prohibited jeans and "athletic shoes or sandals/flip flops." (*Id.*).

1    After the graduating seniors' meeting and a Valley Vista parents' meeting, Mr.

2    Waln asked Assistant Principal Larremore, Principal Lockhart, and Superintendent Kellis

3    to allow Larissa to wear a cap which was beaded and crowned by an eagle feather at the

4    graduation ceremony. All three individual Defendants denied the request. Defendant Kellis

5    informed Plaintiffs Larissa could wear the eagle plume in her hair, around her neck or under

6    her graduation gown, but Larissa and her father responded that in accordance with their

7    religious and cultural beliefs the feather could only be worn on top of her graduation cap.

8    The Native American Rights Fund ("NARF") sent a letter to Defendant Kellis and the

9    American Civil Liberties Union ("ACLU") sent a letter to Defendants Kellis and Pritchard

10    regarding Larissa's desired exemption from the graduation dress code provision

11    prohibiting the embellishment of graduation caps. (ECF No. 7-1; ECF No. 7-3).[7]

12    In response to the requests from NARF and the ACLU, Plaintiffs and those

13    organizations were informed, via letters from counsel for the District, that students

14    choosing to participate in the elective graduation ceremony would need to comply with the

15    dress code. (ECF No. 7-2; ECF No. 7-4). The letters from counsel for the District stated:

16    . . . The District holds commencement exercises to honor the academic
17    achievements of students who have met state and local requirements for

---

19    [7] The letter from NARF states: "Ms. Waln wishes to wear the feather for religious and
20    spiritual reasons in order to honor her Native American heritage, and as a sign of her academic
      success in graduating high school." (ECF No. 7-1 at 2). The letter describes in detail the
21    significance of eagle feathers in Native American culture. The letter further states:
              The beaded cap Ms. Waln wishes to wear carries similar significance. The
22            practice of beading the cap both recognizes individual student success, and also
              highlights role models that inspire younger Native American students in their
23            academic journey. The beaded cap for a high school graduate is a unique, culturally-
              rooted tradition for Native American families that communicates and symbolizes
24            pride in the success of a young family member. Given the high population of Native
              American students in the Phoenix area, such recognition is crucially important for
25            the entire Native American community and should be welcomed. Moreover,
              permitting select students to wear honor cords to show their academic success but
26            denying Native American students from wearing their equivalent of an honor cord
              to demonstrate their academic success discriminates based on viewpoint.
27    (ECF No. 7-1 at 5).
28

graduation from high school. []. A student's participation in commencement is encouraged but not required to receive a high school diploma.

The District's commencement dress code requires all students to wear a cap and gown with tassel without adornment or alteration while participating in the commencement exercises. The reason for this requirement is to preserve the sanctity of the ceremony for graduating students and their families and honor the academic achievements of all students. In addition, the commencement dress code is intended to show respect for the formality of the ceremony, unity for the graduating Class of 2019, and to avoid disruption of the commencement ceremonies that is likely to occur if students are allowed to alter their graduation cap or gown. *This commencement dress code is neutral and applied generally to all graduating students. For instance, the District has also denied a request that seminary students be allowed to wear a special adornment on their gown during the graduation ceremony.*

\*\*\*

You have requested that the student be permitted to wear an eagle feather and beaded cap during the graduation ceremony to honor her Native American heritage. The District recognizes the important religious aspects of eagle feathers to Native Americans. Accordingly, the District will permit a student to wear an eagle feather in his or her hair, as a necklace or as other jewelry. This will allow her to participate in the exercise of her religious symbolic speech at the graduation. No student will be permitted to participate in the commencement ceremony with an adorned or altered commencement cap.

(ECF No. 7-2 at 2-3; ECF No. 7-4 at 2-3) (emphasis added). Additionally, in response to the letter from NARF, the District's counsel also stated: "The District has imposed a reasonable restriction on student speech through its commencement dress code to preserve the sanctity and formality of the commencement ceremony . . ." (ECF No. 7-2 at 3). This letter also stated the "dress code is reasonably related to pedagogical concern [sic] to avoid controversy that may arise if each student was allowed to adorn or alter his or her graduation attire with religious, cultural or familiar emblems or symbols." (*Id.*).

Notwithstanding the denial of Larissa Waln's request to attend the ceremony wearing her decorated graduation cap, Larissa went to the graduation ceremony, at the privately-owned and leased venue at which all District commencement ceremonies were held, with her beaded and adorned cap. (ECF No. 7 at 20). Plaintiffs allege: "At the door,

1    Valley Vista High School officials, including [Defendant] Pierce refused to even allow

2    Larissa to enter the building." (*Id.*).[8]

3        Plaintiffs further allege

4        That same day, May 16, 2019, another student in the School District
5        was not denied entry, but rather permitted to wear what appears to be a breast
     cancer awareness sticker on his graduation cap at the Shadow Ridge High
6        School graduation, which was also held at State Farm Stadium after the
7        Valley Vista High School graduation.

8    (ECF No. 7 at 21). The Amended Complaint alleges: "[d]espite the District's

9    pronouncement that no student would be permitted to participate in any graduation

10   ceremony with an adorned cap, this student participated with an adorned cap in full view

11   of District and school faculty." (*Id.*).

12       Plaintiffs' evidence of this conclusion is an embedded "photo of the Shadow Ridge

13   High School student's adorned cap." (*Id.*). The photograph depicts a student in a graduation

14   gown and cap, with something square affixed to the cap; the photograph appears to be taken

15   after the ceremony was completed, as students are posing for pictures with their diplomas

16   in the background of the photograph, and the "sticker" on the student's cap appears to be a

17   light-purple ribbon on a white background. (ECF No. 7 at 22). The student appears to have

18   a cell phone in one hand and his diploma and another graduation cap in his other hand; the

19   dress code distributed to Valley Vista High School students prohibited them from bringing

20   or carrying anything during the ceremony, such as cell phones, cameras, or purses, and

21   they were instructed to "leave all of this with a parent or other guest" during the ceremony.

22   (ECF No. 7-2 at 8).

23       Plaintiffs allege this student wore the sticker "in full view of the District and school

24   faculty," and assert in their response to the motion to dismiss that the allegation that the

25   ——————————————

26       [8] Defendants assert Larissa Waln was told she could attend the ceremony without the
     adorned cap, that she could wear the eagle feather in her hair, around her neck, or under her
27   graduation robe, or she could elect not to attend the ceremony. (ECF No. 29 at 3). Defendants
     assert Larissa declined to wear an unadorned cap, declined the offered accommodations, and chose
28   to not attend the ceremony. (*Id.*).

individual Defendants saw the student with the sticker on his cap "contradicts Defendants' claim that Plaintiffs do not allege that any of the individual defendants approved or had knowledge of the sticker." (ECF No. 37 at 11). Plaintiffs allege "on information and belief, other students in the Dysart School District had adorned graduation caps or wore prohibited items on their person during their graduation ceremonies," and allege "on information and belief, other similarly-situated graduates from Dysart School District were allowed to wear non-approved attire at their high school graduation ceremonies, including in the same building on the same day as Plaintiff Larissa Waln's graduation." (ECF No. 7 at 23, 32).

### IV.    Discussion

### A.    The Rule 12(b)(6) Standard

When presented with a motion to dismiss pursuant to Rule 12(b)(6) the Court must evaluate the operative complaint to decide whether it states a claim upon which relief may be granted. *E.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001). All "well-pleaded" factual allegations set forth in the complaint are taken as true and construed in the light most favorable to the plaintiff. *E.g.*, *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996).

A court is generally limited to the pleadings when considering a motion pursuant to Rule 12(b)(6). *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *Lee*, 250 F.3d at 686. Rule 12(d) provides:

> . . . [when] matters outside the pleading are presented to and not excluded by the court, [a 12(b)(6)] motion must be treated as one for summary judgment and disposed of as provided in Rule 56. All parties must be given reasonable opportunity to present all the material that is pertinent to the motion.

A court may, however, consider materials attached to the complaint or incorporated by reference in the complaint without converting a Rule 12(b)(6) motion into a summary judgment motion if no party disputes the authenticity of the extraneous material. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Spears v. Arizona Bd. of Regents*, 409 F. Supp. 3d 799, 784

(D. Ariz. 2019). *See also Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 942 n.1 (9th Cir. 2008) (finding it proper to consider disability benefits plan referenced in the complaint, but declining to accept the truth of the plan's contents where the parties disputed whether the defendant actually implemented the plan according to its terms). Plaintiffs incorporate two photographs in their Amended Complaint, and attached to and referenced in the Amended Complaint are several documents, including a letter from Defendant Lockhart delineating the graduation ceremony dress code and letters to and from the ACLU and NARF and the District's legal counsel. Defendants do not dispute the authenticity of the extraneous material and, accordingly, the Court may consider the material to resolve the pending motion to dismiss without converting the motion to one for summary judgment.

A complaint must provide a "short and plain statement of the claim" showing the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). To withstand a Rule 12(b)(6) motion the complaint must, at a minimum, plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*"). *See also Weber v. Department of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). However, the Court is not required to accept as true allegations that contradict exhibits incorporated in the complaint, nor must it accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall*, 629 F.3d at 9980. *See also Sgro*, 532 F.3d at 942 n.1.

Additionally, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir.1994), *citing Papasan v. Allain*, 478 U.S. 265, 286-89 (1986). The Court is not required to blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). *See also Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (stating that "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited."), *cited in*

*Martinez v. Goddard*, 521 F. Supp. 2d 1002, 1011 (D. Ariz. 2007). *See also Drescher v. Bracco Diagnostics Inc.*, 2020 WL 1466296, at *4 (D. Ariz. Mar. 26, 2020).[9] *But see In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), *and Taylor v. F.D.I.C.*, 132 F.3d 753, 762 (D.C. Cir. 1997).

> Two working principles underlie *Twombly*. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. [*Twombly*, 550 U.S.] at 555. Second, determining whether a complaint states a plausible claim for relief is a context-specific task, requiring the reviewing court to draw on its experience and common sense. *Id.* at 556 [].

*Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009).

Although legal conclusions can provide the complaint's framework, to survive a motion to dismiss they must be supported by sufficient factual allegations. *Id.* at 678. A complaint must do more than state a conclusory allegation that each element of the plaintiff's cause of action is established; the plaintiff must plead "plausible" facts that indicate a cognizable basis for liability.[10] *Id.* at 679. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678, *quoting Twombly*, 550 U.S. at 557. Accordingly, to survive Defendants' motion to dismiss, the non-conclusory "factual content" of Plaintiffs' Amended Complaint, and the reasonable inferences which can be drawn therefrom, must be plausibly suggestive of a legitimate claim to relief. *Id.* at 696.

---

[9] The *Drescher* court concluded that the information provided by the plaintiff in an attachment to their complaint did not "provide a basis for a reasonable inference" that the drug manufactured by the defendant and injected into the plaintiff caused her alleged harm, a factual allegation necessary to her cause of action: "the information provided by Plaintiff shows that the FDA found, after inquiry and studies, that it could not establish a causal association between adverse health effects" alleged by the plaintiff. *Drescher v. Bracco Diagnostics Inc.*, 2020 WL 1466296, at *4 (D. Ariz. Mar. 26, 2020).

[10] Black's Law Dictionary (11th ed. 2019) defines "plausible" as: "1. Conceivably true or successful; possibly correct or even likely; REASONABLE (2) <a plausible account>. 2. (Of a person) reasonably convincing and seemingly truthful, though possibly mendacious <a plausible liar>."

The relevant question for a court in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether "the complaint warrant[s] dismissal because it fail[s] in toto to render plaintiffs' entitlement to relief plausible." *Twombly*, 550 U.S. at 569 n.14. The Ninth Circuit has held that the *Iqbal/Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017),[11] *citing Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). The *Twombly* standard permits allegations on information and belief where: (1) "the facts are peculiarly within the possession and control of the defendants;" or (2) "the belief is based on factual information that makes the inference or culpability plausible." *Soo Park*, 851 F.3d at 928 (9th Cir. 2017). *See also Barnes v. Harris*, 783 F.3d 1185, 1196-97 (10th Cir. 2015) (concluding the plaintiffs had not stated a plausible claim for relief because "the facts in question were not entirely within defendants' control."). Although facts may be alleged upon information and belief, that does not mean that purely conclusory allegations are per se plausible. A purely conclusory allegation based on information and belief remains insufficient under *Iqbal/Twombly*. *See Arista*, 604 F.3d at 120 (noting that,

---

[11] In *Soo Park*, a § 1983 conspiracy case, the plaintiff alleged on information and belief that a police detective conspired with "others." The Ninth Circuit concluded the plaintiff had pled sufficient facts to state a plausible claim for § 1983 conspiracy because she pled the following facts:

"[a]fter the District Attorney received notice that [the plaintiff] planned to call Ayala as a defense witness, and after Detective Thompson's phone conversation with Ayala, Thompson and/or a Doe defendant allegedly contacted the El Segundo Police and convinced an officer to initiate charges against Ayala";

"[t]he District Attorney then unexpectedly brought felony criminal charges against Ayala stemming from a physical dispute with Gilmore [an individual who may have actually killed the victim] approximately a year earlier";

"[s]hortly afterwards, at [the plaintiff's] criminal hearings, Ayala declined to testify at [the plaintiff's] trial because of these pending charges and after the Deputy District Attorney threatened to 'recuse' her attorney if he did not advise her to invoke her Fifth Amendment privilege"; and

"[f]ollowing Ayala's refusal to testify, the District Attorney dismissed the felony charges, and Ayala received a probationary sentence after pleading no contest to a misdemeanor charge."

*Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

1   "[b]ecause the *Twombly* complaint's factual allegations described only actions that were

2   . . . doctrinally consistent with lawful conduct, the conclusory allegation on information

3   and belief that the observed conduct was the product of an unlawful agreement was

4   insufficient to make the claim plausible."). Additionally, the Ninth Circuit has indicated

5   that the plausibility requirement should be relaxed primarily in cases where the facts

6   alleged upon information and belief "are peculiarly within the possession and control of

7   the defendant or where the belief is based on factual information that makes the inference

8   of culpability plausible. . . . We relax pleading requirements where the relevant facts are

9   known only to the defendant." *Soo Park*, 851 F.3d at 928.

10      **B.      Adequacy of Plaintiffs' Factual Allegations**

11          *Twombly* requires "a flexible 'plausibility standard,' which obliges a pleader
         to amplify a claim with some factual allegations in those contexts where such
12          amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490
         F.3d 143, 157-58 (2nd Cir. 2007); *see also Moss v. U.S. Secret Service*, 572
13          F.3d 962 (9th Cir. 2009) (for a complaint to survive a motion to dismiss, the
         non-conclusory "factual content," and reasonable inferences from that
14          content, must be plausibly suggestive of a claim entitling the plaintiff to
         relief).
15

16

17   *Spears*, 372 F. Supp. 3d at 907.

18          In keeping with the principles stated in *Twombly* and *Iqbal*, the Court begins by

19   identifying allegations that, because they are mere conclusions, are not entitled to the

20   assumption of truth. *See Iqbal*, 556 U.S. at 679; *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135

21   (9th Cir. 2014) (setting forth the two-step process for evaluating pleadings); *Chavez v.*

22   *United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("a court discounts conclusory

23   statements, which are not entitled to the presumption of truth, before determining whether

24   a claim is plausible"). Although precise knowledge of the chain of events leading to an

25   alleged constitutional violation may often be unavailable to a plaintiff at an early stage of

26   the litigation, the Court must "take to heart" the Supreme Court's admonition to "draw on

27   our 'judicial experience and common sense' as we make a contextual judgment about the

28

1   sufficiency of the pleadings." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 16 (1st

2   Cir. 2011), *quoting Iqbal*, 556 U.S. at 678.

3        In this matter, Plaintiffs assert on information and belief that the individual

4   Defendants gave "other students" "permission" to augment their graduation caps, while

5   Larissa's request for an exemption from the commencement dress code was denied on the

6   basis that her proposed embellishments were religious expression. (ECF No. 7 at 3, 4, 21).

7   Plaintiffs allege the District "simultaneously permitt[ed] other students to express their

8   activism and secular interests, through permitted or tolerated adornments on their caps

9   and/or gown." (ECF No. 7 at 25). Plaintiffs assert the District made "liberal concessions"

10  to "other students, who made additions to their caps (including an oversized breast-cancer

11  awareness sticker) of a non-religious nature," and were allowed "to walk in their

12  ceremonies." (ECF No. 7 at 33). A critical element of Plaintiffs' claims, particularly their

13  equal protection claim, is that "other students," and specifically the student in the

14  photograph incorporated into their Amended Complaint, were given "permission" by one

15  of the "Individual Defendants" who denied Larissa such permission, to participate in the

16  District graduation ceremony wearing a decorated graduation cap. These allegations

17  require careful evaluation in light of the principles described above.

18       The conclusory allegations that the pictured student or other students (plural) were

19  allowed exceptions to the dress code are not supported by sufficient factual content. These

20  conclusions are not based on any allegation of fact "peculiarly within the possession and

21  control" of Defendants, or based on a specific factual allegation that makes plausible

22  Plaintiffs' assertion that the "Individual Defendants" granted other students exemptions to

23  the policy prohibiting the adornment of a graduation cap. Plaintiffs' allegation that the

24  "Individual Defendants" gave multiple students in the District leave to adorn their caps is

25  conclusory, not specific, not numerous and, therefore, not plausible.

26       Plaintiffs' factual allegation that the "Individual Defendants" enforced the dress

27  code only against Larissa is supported only by a single unauthenticated photograph, taken

28  at a different Dysart high school's graduation, in which an unidentified student appears to

have a sticker of some kind on his graduation cap. Plaintiffs allege this individual was "permitted [by one or more or all of the Individual Defendants] to wear what appears to be a breast cancer awareness sticker on his graduation cap at the Shadow Ridge High School graduation . . ." (ECF No. 7 at 21). Plaintiffs' allegation that the "Individual Defendants" gave the pictured student permission to "participate" in the ceremony with the sticker on his cap is not supported by the photograph itself. The photograph shows a student with a sticker of some kind on a cap, after the conclusion of the ceremony (the photograph depicts students posing for pictures with their diplomas in hand). Critically, the student appears to have an undecorated graduation cap in the same hand as his diploma. Additionally, because the student is from a different high school and the graduating students' attire was, per Plaintiffs' Amended Complaint, vetted by each high school's administration just prior to each student entering the site of the ceremony, the Amended Complaint does not plausibly suggest that any Valley Vista High School administrator allowed this student to violate the dress code, or plausibly suggest that the Governing Board or Superintendent Kellis allowed this student an exemption from the dress code. Plaintiffs attempt to identify a single instance of a graduation cap adorned in seeming violation of the purportedly District-wide dress code, out of the approximately 1800 graduating seniors that participated in the Dysart commencement ceremonies on May 16, 2019. Because Plaintiffs do not identify the pictured student, there is no way of determining whether or not the student wore the augmented cap during the graduation ceremony, or whether he actually received permission to augment the cap, or whether the student simply placed the sticker on the cap at some point without permission, or whether a family member held the adorned cap while he attended the ceremony in the apparently unadorned cap depicted in the photograph. Furthermore, the allegation that "other students" were given permission to augment their graduation caps prior to the ceremonies, while Larissa Waln's request was denied because she sought religious expression, is belied by the documentation provided by Plaintiffs as exhibits to their Amended Complaint, i.e., the letter from the District's counsel advising

1   that seminarians were denied permission to display religious symbols on their graduation
2   attire.

3       A critical element of Plaintiffs' claims is that "other students," and specifically the
4   student in the photograph incorporated in their Amended Complaint, were given
5   "permission" by one of the "Individual Defendants" who denied Larissa such permission,
6   to participate in the District graduation ceremony wearing a decorated graduation cap.
7   However, this factual allegation is actually a conclusion which cannot reasonably be drawn
8   from Plaintiffs' Amended Complaint. Given that Plaintiffs do not dispute that the District
9   denied seminarians an exception from the dress code, it more plausible that the pictured
10  student passed by his own high school's Assistant Principal with two caps, one decorated
11  and one not, or that the student had a sticker somewhere on his person, and that the student
12  either placed the sticker on his cap without permission or replaced the unadorned cap with
13  a cap adorned with the sticker after the ceremony. Plaintiffs' allegation upon "information
14  and belief" that "other students," i.e., students other than the one pictured, were also given
15  permission to participate in the District's graduation ceremonies with decorated caps is
16  simply not plausible under the legal framework set out in *Twombly* and *Iqbal* .[12]

17      In the absence of specific factual allegations that a named defendant personally and
18  actively participated in the deprivation of a constitutional right, including an equal
19  protection claim which requires the defendant to have acted with a discriminatory purpose,
20  and where there are other "more likely" explanations for the defendant's actions, a claim
21  may be dismissed pursuant to *Twombly*. *See Argueta v. United States Immigration*

22

23  [12] . . . To plead a cognizable claim, a complaint must "include sufficient 'factual
24  enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic
    Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014)
25  (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 [] (2007)). When faced with
    "two possible explanations, only one of which can be true and only one of which
26  results in liability . . . [s]omething more is needed, such as facts tending to exclude
    the possibility that the alternative explanation is true, in order to render plaintiffs'
27  allegations plausible." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108
    (9th Cir. 2013).
28  *Prudencio v. Midway Importing, Inc.*, 831 F. App'x 808, 810 (9th Cir. 2020).

& *Customs Enf't*, 643 F.3d 60, 76 (3d Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 305 (4th Cir. 2008). Under *Twombly*'s construction of Rule 8, the Court concludes that Plaintiffs have not "nudged" their claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680-81.[13] *See also Robbins v. Oklahoma*, 519 F.3d 1242, 1253 (10th Cir. 2008) ("As it stands, the complaint encompasses a broad range of imaginable circumstances, only some of which, if any, would entitle the plaintiffs to relief and therefore, 'stops short of the line between possibility and plausibility of entitlement to relief.' *Twombly*, 127 S. Ct. at 1966."); *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1221 (10th Cir. 2011) (finding the plaintiff's "'naked assertion [] devoid of further factual enhancement,'" that a defendant was involved in the act allegedly violated the plaintiff's constitutional rights, was the type of allegation "that *Iqbal* instructs us to disregard.").

## C. 42 U.S.C. § 1983

Section 1983 provides a cause of action against "a person" who, under "color" of state law or authority, deprives the plaintiff of any constitutionally protected right. The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive

---

[13] The *Iqbal* Court found and concluded:

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." [] The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, [], and that Mueller was "instrumental" in adopting and executing it []. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555 [], namely, that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S., at 279 []. As such, the allegations are conclusory and not entitled to be assumed true. *Twombly*, 550 U.S., at 554-555 []. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth. 556 U.S. at 680-81.

individuals of their federally guaranteed rights, and to provide relief to victims if such deterrence fails. *E.g.*, *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *McDade v. West*, 223 F.3d 1135, 1139-40 (9th Cir. 2000).

Rights that are protected under § 1983 are personal to the injured party and, therefore, a plaintiff may not be awarded damages based on the violation of another individual's federal constitutional rights. The "case or controversy" requirement of Article III of the United States Constitution limits the federal courts' jurisdiction by requiring that plaintiffs have "standing" to bring the lawsuit. *See*, *e.g.*, *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848-49 (9th Cir. 2007). In order to have standing, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A plaintiff lacks standing to bring suit of any kind based on harms done to others. *Id. See also McCollum v. California Dep't of Corr. & Rehab.*, 647 F.3d 870, 879 (9th Cir. 2011); *Fleck & Assocs., Inc. v. City of Phx.*, 471 F.3d 1100, 1105 (9th Cir. 2006). And, "[a]part from the jurisdictional requirement" of standing to bring suit, the federal courts have "developed a complementary rule of self-restraint . . . (not always clearly distinguished from the constitutional limitation) which ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). *See also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Plaintiffs name as Defendants the Dysart School District, the Dysart School District Governing Board, five individual members of the Governing Board, Kellis (the Superintendent of the Dysart School District), and Valley Vista High School Principal Lockhart and Assistant Principals Larremore and Pierce; the individual Defendants are all named as defendants in both their individual and official capacities.

A plaintiff suing a defendant in their individual capacity pursuant to § 1983 must demonstrate that the particular named defendant personally participated in the deprivation of the plaintiff's rights. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). There

must be an actual connection or link between an overt act of the defendant and the deprivation allegedly suffered by the plaintiff. *E.g.*, *Ortez v. Washington Cty.*, 88 F.3d 804, 809 (9th Cir. 1996); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).[14] A suit against a defendant in their individual capacity seeks to impose personal liability upon the official. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). For a person to be liable in their individual capacity, "[a] plaintiff must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of [her] civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). By comparison, a suit against a defendant in their official capacity represents only another way of pleading an action against the entity that employs the defendant. *Kentucky*, 473 U.S. at 165. That is, the real party in interest is not the named defendant but the entity that employs the defendant. *Id.* Because suing an individual in their official capacity is the equivalent of suing a governmental entity itself, the Court must dismiss as duplicative any claims asserted against an individual defendant sued in their official capacity when the entity is also a named defendant. *See*, *e.g.*, *id.* at 159; *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *Vance v. County of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996); *Ponce v. Lloyd*, 46 F.3d 1144, 1995 WL 29489, at *1 (9th Cir. Jan. 25, 1995).

To establish a claim against an individual in their official capacity, a plaintiff must show that the constitutional deprivation resulted from the entity's policy, custom, or practice. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). There is no "supervisory" liability under §1983 and, accordingly, the fact that an employee of an entity amenable to suit violated an individual's constitutional rights does not, in and of itself, impugn the entity. However, in *Monell v. Department of Social Services of New York*, the Supreme Court held that the word "person" in § 1983 includes municipalities and other

---

[14] Plaintiffs allege, *inter alia*: Principal Lockhart met with Mr. Waln and refused an exception to the graduation dress code; Assistant Principal Larremore conducted the "senior meeting" at which Larissa learned she "might not" be able to wear the adorned cap and, in a telephone conversation with Mr. Waln, refused Larissa an exception to the dress code. (ECF No. 7 at 13). Plaintiffs further allege Assistant Principal Pierce refused Larissa entry to the graduation ceremony wearing her beaded cap. (ECF No. 7 at 20).

local governing bodies, a holding which has been extended to school districts. A school district may be held liable under *Monell* pursuant to any of the following three theories: when a "district employee was acting pursuant to an expressly adopted official policy;" when a "district employee was acting pursuant to a longstanding practice or custom;" or when a "district employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). *See also Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2001); *Ryan v. Mesa Unified Sch. Dist.*, 64 F. Supp. 3d 1356, 1361 (D. Ariz. 2014); *Doe v. Round Valley Unified Sch. Dist.*, 873 F. Supp. 2d 1124, 1135 (D. Ariz. 2012). A policy is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). A decision properly made by a local governmental entity's authorized decision maker—that is, an official with final authority to establish policy with respect to the challenged action—may constitute official policy. *See Thompson v. City of L.A.*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cty. of S. F.*, 595 F.3d 964 (9th Cir. 2010).

Plaintiffs assert the Dysart School District is liable for violating Plaintiffs' free speech and free expression rights because Superintendent Kellis and the Governing Board members, all purportedly with "final policymaking authority," took "discriminatory actions" against Larissa, i.e., they enacted a content-neutral dress code and denied her an exemption from that dress code, which deprived her of her rights to free speech and the free exercise of her religion. Plaintiffs argue: "the District did have a 'policy, custom, or practice' of prohibiting students from altering or adorning their graduation caps and gowns, and this policy provided no accommodation for Native American religious regalia. This policy is sufficient to establish a Section 1983 claim." (ECF No. 37 at 15).[15]

---

[15] Plaintiffs cite *C.R. v. Eugene School District 4J*, 835 F.3d 1142, 1147 n.1 (9th Cir. 2016) for the proposition that the "'policy, custom, or practice'" requirement is met when a student is "disciplined pursuant to school district policy." (ECF No. 37 at 15-16). In that case a student was suspended from school for sexually harassing two disabled students in a public park a "few hundred feet" from the school within a few minutes of leaving school. *Id.* at 1150-51. The student

1    Plaintiffs allege the Governing Board members, acting as final policymakers,

2  violated her First Amendment rights by enacting a policy which did not allow for

3  expressive speech or the free exercise of her religion.[16] Plaintiffs also allege Superintendent

4  Kellis violated her constitutional rights by enforcing the policy and not exempting her from

5  the policy, and the Valley Vista Principal and Assistant Principals also violated her

6  constitutional rights by enforcing the policy and not exempting her from the policy. The

7  Governing Board's graduation dress code policy was content-neutral, not an official policy

8  of unconstitutionally denying students their rights to free speech or free expression. The

9  facts alleged in the Amended Complaint do not support a finding that the District had a

10 _____

11 asserted violations of his rights to free speech and due process. The court concluded the students'
   free speech and due process rights were not violated by the suspension because the school's

12 interpretation of its rules and policies, which were not facially unconstitutional, was reasonable.

13 [16] Plaintiffs assert the graduation ceremony dress code was set by the Governing Board,
   citing the language used by Dysart's counsel's in the letters sent in response to the written requests

14 from NARF and the ACLU to allow Larissa to attend the graduation ceremony wearing an adorned
   cap. Attached to the Amended Complaint is the Governing Board's policies with regard to

15 graduation exercises, dated August 19, 2015; none of the policies regarding "Graduation
   Exercises" mentions student dress at commencement. (ECF No. 7-2 at 6). Defendants assert each

16 high school within the District set its own dress code with regard to the graduation ceremony, and
   attached to the motion to dismiss is the Governing Board's policy with regard to "Student Dress,"

17 which indicates no specific dress code other than when a student's "choices affect the educational
   program of the schools or the health and safety of others," and further states "[t]he Superintendent

18 shall not fail to develop procedures for establishing and for meeting requirements set for student
   dress." (ECF No. 29-1 at 24). The only written "evidence" of the actual graduation-specific dress

19 code in the record is the written statement made by the principal of Valley Vista High School
   issued on the school letterhead. (ECF No. 7-2 at 8). It is entirely possible Dysart's counsel

20 misspoke when he stated in the letters to NARF and the ACLU that the dress code prohibiting the
   adornment of caps was issued by the District. However, for purposes of a Rule 12(b)(6) motion

21 the Court must accept the facts pled by the plaintiff are true unless implausible and it is plausible
   that the graduation dress code was set by the District.

22 However, if the graduation dress code was established by the Governing Board, it is unclear
   how Superintendent Kellis' or the Valley Vista High School Principal or the Assistant Principals'

23 refusal to allow Larissa an exception to the dress code could be construed as an act of a "final

24 policymaker." If the dress code was set by the members of the Governing Board as "final
   policymakers," it would seem the Principal and Assistant Principals, and possibly Superintendent

25 Kellis, would not have the power to grant an exemption to the dress code. Conversely, if the
   graduation dress code was set by the Valley Vista Principal and/or Assistant Principals and they

26 could exempt Larissa from the dress code, then the Governing Board would not seem to be the

27 "final" policymakers.

28

- 21 -

1  longstanding custom or practice of violating students' rights to free expression or freedom

2  of speech by means of a commencement dress code.

3  The only affirmative "act" by any individual Governing Board member as a "final

4  policymaker" that Plaintiffs specifically allege violated her constitutional rights is their

5  promulgation of the content-neutral graduation dress code. As explained more thoroughly

6  *infra*, the promulgation of a content-neutral dress code did not violate Larissa's

7  constitutional rights. Presumably, then, the allegedly unconstitutional acts of the other

8  Defendants were their denials of Larissa's sought-after exemption from the dress code

9  based on her right to free expression of her religion or her right to free speech.

10  Plaintiffs' claims against the individual Governing Board members in their official

11  capacities are essentially claims against the Governing Board and the District. *Kentucky*,

12  473 U.S. at 166; *Gomez v. Vernon*, 255 F.3d 1118, 1126 (9th Cir. 2001) ("A suit . . . against

13  a governmental officer in his official capacity is equivalent to a suit against the

14  governmental entity itself." (citation omitted)); *Vance v. County of Santa Clara*, 928 F.

15  Supp. 993, 996 (N.D. Cal. 1996) ("if individuals are being sued in their official capacity as

16  municipal officials and the municipal entity itself is also being sued, then the claims against

17  the individuals are duplicative and should be dismissed."). The Governing Board is not,

18  arguably, an entity amenable to suit under §1983, although the District is a local entity

19  amenable to suit. Accordingly, the Court will dismiss the claims against the Governing

20  Board as an entity, and against the individual Governing Board members in their official

21  capacities because these claims are duplicative of the claims against the District.

22  **D.    Qualified Immunity**

23  The Court concludes the named individual Defendants, as sued in their individual

24  capacities, are immune from suit for monetary damages under the doctrine of qualified

25  immunity. Government officials acting in their individual capacities are entitled to

26  qualified immunity from suit for monetary damages pursuant to § 1983 unless they

27  personally violated the plaintiff's constitutional rights and the unlawfulness of their

28  conduct was clearly established at the time of the alleged violation. *See District of*

1   *Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664

2   (2012). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all

3   but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*,

4   502 U.S. 224, 229 (1991), *quoting Malley v. Briggs*, 475 U.S. 335, 343 (1986). *See also*

5   *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to

6   acknowledge that reasonable mistakes can be made as to the legal constraints on particular

7   [] conduct."); *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

8          The Supreme Court has counseled the federal district courts to resolve the issue of

9   qualified immunity at the earliest possible point in litigation, *see Pearson v. Callahan*, 555

10  U.S. 223, 231-32 (2009), because the entitlement to qualified immunity "is an immunity

11  from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526

12  (1985). *See also Hunter*, 502 U.S. at 227. Although it "is often beneficial" to begin the

13  qualified-immunity analysis by addressing whether a statutory or constitutional right has

14  been violated, federal district courts are vested with discretion to determine "which of the

15  two prongs of the qualified immunity analysis should be addressed first in light of the

16  circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

17         "Once the defense of qualified immunity is raised by the defendant, the plaintiff

18  bears the burden of showing that the rights allegedly violated were 'clearly established'"

19  at the time of the alleged violation. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).

20  *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991). In determining whether

21  a constitutional right was clearly established at the time of the alleged violation, "a case

22  directly on point" is not required, "but existing precedent must have placed the statutory or

23  constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) ("At

24  the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render

25  an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional.").

26  To determine whether a constitutional right was clearly established such that qualified

27  immunity does not shield a §1983 defendant, the Court looks first to Supreme Court and

28  Ninth Circuit law existing at the time of the alleged act. *See Chappell v. Mandeville*, 706

F.3d 1052, 1056-57 (9th Cir. 2013), *citing Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the Court looks to available decisions of other circuit courts of appeal and district courts to ascertain whether the law was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 244-45;[17] *Osolinski*, 92 F.3d at 936.

The relevant inquiry as to whether the allegedly violated right was "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.[18] For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of preexisting law," and taking the facts in a light favorable to the plaintiff, "the unlawfulness must be apparent." *Id.* "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable [individual] that his conduct was unlawful in the situation he confronted." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010), *quoting Saucier*, 533 U.S. at 202 (alteration in original). If the individual defendant had a "reasonable" belief that their action was within the bounds of constitutional law, they are entitled to qualified immunity even if they are mistaken regarding the exact parameters of "legal" action in the specific context in which they acted. *Saucier*, 533 U.S. at 208-09. In

[17] The *Pearson* Court held police officers' entry into a home without a warrant to make an arrest, based on consent to enter given to an informant who then summoned officers to the porch of the residence, did not violate clearly established law and, accordingly, the officers were protected by qualified immunity from the arrestee's Fourth Amendment claim. The Supreme Court noted that, although the precise issue had not been decided in the Circuit Court of Appeals having jurisdiction over the officers, the "consent-once-removed" doctrine had been accepted by three federal Circuit Courts of Appeals and two state supreme courts, and "no court of appeals had issued a contrary decision," and therefore the officers' reliance on the doctrine to presume their conduct did not violate the constitution was reasonable. *See Pearson v. Callahan*, 533 U.S. 194, 244-45 (2009).

[18] The Supreme Court "receded" from *Saucier* in *Pearson*, by stating that the two prongs of a qualified immunity test need not be undertaken in any specific order. *See Pearson*, 533 U.S. at 236.

1    other words, the case law must "have been earlier developed in such a concrete and

2    factually defined context to make it obvious to all reasonable government actors, in the

3    defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa*

4    *Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148,

5    1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—

6    not to define clearly established law at a high level of generality." (quotation omitted));

7    *Ryan*, 64 F. Supp. 3d at 1362.

8           Defendants and Plaintiffs have cited to numerous cases analyzing what constitutes

9    a violation of a student's rights to free speech and the free expression of religion, and what

10   level of scrutiny applies, in contexts other than a content-neutral commencement ceremony

11   dress code to which the plaintiff was not granted an exemption. Defendants do cite

12   *Dreaming Bear v. Fleming*, 714 F. Supp. 2d 972 (D.S.D. 2010), and *Griffith v. Caney*

13   *Valley Public Schools*, 157 F. Supp. 3d 1159 (N.D. Okla. 2016), which are the cases most

14   factually similar to the instant matter. Plaintiffs argue *Dreaming Bear* and *Griffith* do not

15   control the question of qualified immunity because they are opinions of district courts not

16   within the Ninth Circuit's jurisdiction. However, there is no "existing precedent" at all

17   (much less from the Ninth Circuit Court of Appeals) which places the constitutional

18   question regarding Plaintiffs' claims "beyond debate" one way or the other, because none

19   of the cases cited by Plaintiffs in support of their position are factually similar to the matter

20   before the Court. *Griffith* is the only case directly on point, and the Court finds this opinion

21   well-reasoned and the Court further finds this opinion places beyond debate the conclusion

22   that the individual Defendants as sued in their individual capacities are entitled to qualified

23   immunity.

24          A graduating high school student's right to wear a graduation cap adorned with

25   traditional beadwork or an eagle feather to a high school graduation ceremony, pursuant to

26   an exemption from a content-neutral dress code, was not clearly established under the First

27

28

Amendment's free speech or free exercise of religion clause in 2019.[19] The only factually similar cases which the Court has been able to identify after diligent research are *Griffith* and *Dreaming Bear*. Both of those published opinions were issued from federal trial courts, and neither case was appealed to the relevant Circuit Court of Appeals, i.e., the Tenth Circuit in the case of *Griffith* and the Eighth Circuit in the case of *Dreaming Bear*. All of the decisions issued by the Ninth Circuit Court of Appeals prior to May of 2019 bearing on the issue of a student's right to the free expression of religion or free expressive speech with regard to a high school graduation were decided against the student. None of the cases in which the Ninth Circuit Court of Appeals has evaluated the extent of a student's right to free speech by means of expressive speech or free expression of their religion have involved a facially-neutral dress code governing only a graduation ceremony and the school or school district's refusal to allow a student an exception from that dress code. And, in the cases which are somewhat factually similar, the opinions from the Ninth Circuit have generally not been favorable to the student even when the school was applying a *content-specific* prohibition on the student's actions. *See Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979 (9th Cir. 2003) (holding a high school salutatorian's constitutional rights to freedom of religion, speech, and equal protection were not violated by the denial of his request to include religious proselytizing comments in a commencement address); *Cole*, 228 F.3d at 1096, 1101 (holding school district did not violate a co-valedictorian's right to free speech and free expression by requiring him to "tone down the proselytizing and sectarian religious references" in his graduation speech). *See also Nurre v. Whitehead*, 520 F. Supp. 2d 1222, 1231 (W.D. Wash. 2007), *aff'd*, 580 F.3d 1087 (9th Cir. 2009). The *Nurre* court noted a school could enforce even a content-based prohibition on expressive speech if the prohibition preserved the purpose for which the government actor had created a limited public forum. *Id.*

---

[19] Plaintiffs' allegation that Larissa's equal protection rights were violated is predicated, at least in part, on the assertion that Defendants violated one of her "fundamental" rights, i.e., her rights to free speech and/or free expression of her religion.

In *Griffith*, the court granted the defendants' motion to dismiss a Native American student's claim that the defendant school district and school officials violated the student's rights to free speech and free exercise of her religion by denying the student's request to wear an eagle feather on her cap during a graduation ceremony. *See* 157 F. Supp. 3d at 1164, 1166. Additionally, Plaintiff's First Amendment claims in this matter are similar to those asserted in *Dreaming Bear*, in which the District of South Dakota concluded, on the plaintiff's motion for injunctive relief and the defendant's motion to dismiss, that the defendant school district did not violate the student's First Amendment rights to expressive speech by requiring him to wear a gown over traditional tribal clothing at his high school graduation ceremony. *See* 714 F. Supp. 2d at 990.

Qualified immunity applies "when an [individual] reasonably believes that his or her conduct complies with the law" even if the individual makes "a mistake of law, a mistake of fact, or a mistake based upon mixed questions of law and fact." *Pearson*, 555 U.S. at 245. The individual Defendants in this matter could reasonably believe that their conduct complied with the law; Principal Lockhart and Assistant Principals Larremore and Pierce were implementing a content-neutral graduation dress code set by the District. Superintendent Kellis consulted with Dysart's outside counsel to ensure that the District was acting within the protections afforded students by the United States Constitution when determining whether Larissa's request for an exemption from the dress code would violate her federal constitutional rights. The primary disagreement Plaintiffs' legal advisers (NARF and the ACLU) expressed with regard to whether or not Larissa was entitled to an exemption was the level of scrutiny to be applied to the District's graduation dress code and its application to Larissa. As explained more thoroughly *infra*, the content and viewpoint-neutral dress code was not subject to strict scrutiny, as Plaintiffs argue, nor did the application of the dress code to Larissa violate her rights to free speech, free expression of her religion, or equal protection.

The vast majority of controlling legal precedent with regard to a student's rights to free speech and free expression of their religion at a high school graduation ceremony

reveals the dilemmas a school faces when balancing the constitutional rights of all of the students attending the ceremony. The cases from the Ninth Circuit Court of Appeals do not involve a student's dress or embellishment of their graduation attire, they involve a student's desire to pray, or have prayer offered, or to be free of such prayer at the commencement ceremony, and one case involves a student's desire to have "Ave Maria" performed by the school wind ensemble at the ceremony. *See Nurre v. Whitehead*, 580 F.3d 1087, 1090 (9th Cir. 2009). Clearly, a blanket prohibition on students decorating their graduation caps would avoid the situation of a school official having to evaluate potentially hundreds of graduation caps on the day of commencement to ensure that each student's graduation cap did not have a potentially offensive, disruptive, or religious message, or determining whether any student asserting they had previously been given permission to display expressive speech on their cap had indeed been given such permission.

In the above-cited cases the federal district courts and Ninth Circuit Court of Appeals ultimately concluded that the students' rights to free speech and free expression were not violated by the school administration's refusal to allow prayer or religious music because the school would otherwise be violating the graduating students' constitutional right to be free of the establishment or endorsement of religion. Indeed, the federal courts have repeatedly prohibited public schools from entangling their high school graduation ceremonies with religious observances. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Lassonde*, 320 F.3d at 983. As explained more thoroughly *infra*, the courts have repeatedly affirmed school officials' ability to regulate student speech during graduation ceremonies. *See*, *e.g.*, *Cole*, 228 F.3d at 1101. Notably, the schools have had to wrestle with the contours of one student's First Amendment right to free speech and another student's First Amendment Establishment Clause rights to be free of a school's potential endorsement of religious expression at a school event, which requires courts and government officials to navigate a "legal labyrinth." *Nurre*, 580 F.3d at 1090. Given the acknowledged existence of this "legal labyrinth," in this matter "[i]t would be inappropriate 'to hold government officials to a higher level of knowledge and understanding of the legal

landscape than the knowledge and understanding displayed by judges whose everyday business it is to decipher the meaning of judicial opinion.'" *Seidman v. Paradise Valley Unified Sch. Dist. No. 69*, 327 F. Supp. 2d 1098, 1119-21 (D. Ariz. 2004), *citing Denno v. School Bd. of Volusia Cty.*, 218 F.3d 1267, 1274 (11th Cir. 2000).

And, with no clear authority from the Ninth Circuit Court of Appeals in a matter anywhere near factually similar to this matter, the Court considers the two cases which are almost factually identical to this matter, *Griffith* and *Dreaming Bear*, which are well-reasoned and have not been called into doubt by any federal court and were not appealed by the plaintiffs therein.

Plaintiffs do not cite to any legal opinion issued by the United States Supreme Court or the Ninth Circuit Court of Appeals concluding that the promulgation of, or denying a Native American graduating high school student an exemption from, a content-neutral graduation ceremony dress code prohibiting the adornment of a graduation cap violated the student's right to free speech or the free expression of their religion, or otherwise violated the student's federal constitutional rights. Plaintiffs contend neither *Dreaming Bear* nor *Griffith* are on point because these cases applied, they assert, the wrong level of scrutiny, citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017). Plaintiffs argue that in "[i]n *Trinity Lutheran*, the Supreme Court recognized that it 'has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order.' *Id.* at 2019 (quotation marks omitted)."[20] (ECF

_____

[20] *Trinity* is not on point, and is not a free speech case. In that matter a church, which operated a religious preschool and daycare program, brought an action asserting free exercise claims against Director of Missouri Department of Natural Resources, challenging the Department's denial of the church's application for a competitively-awarded grant for purchase of rubber playground surfaces. The Department's denial of the church's application was based on the Department's stated policy of denying grants to religiously affiliated applicants. The Eighth Circuit Court of Appeals affirmed the lower court's dismissal of the case. The Supreme Court reversed and remanded. The majority opinion, authored by Chief Justice Roberts, concluded the church's challenge to the official policy of the Department expressly discriminating against religious organizations was subject to the strictest scrutiny and that the Department's policy violated the church's rights under the Free Exercise Clause of the First Amendment by denying the church an

- 29 -

No. 37 at 17). Plaintiffs' primary argument, with regard to both the holding in *Trinity* and throughout their pleadings, is that the graduation dress code must be subjected to strict scrutiny, rather than intermediate scrutiny or the "rational basis" test.

*Trinity* did not involve a school's discrimination against an individual's "religious exercise" or free speech, and the church in *Trinity* was not prohibited from "religious exercise" but instead was denied a government benefit, i.e., a financial subsidy, because it was a religious organization. Additionally, in support of their claims that the named individual Defendants unfairly denied Larissa an exemption from the dress code, Plaintiffs rely on an implausible allegation that "other students at the graduation were permitted to express secular non-school-related messages on their graduation cap." Even if this allegation were plausible, the Amended Complaint does not identify the named individual Defendant who "permitted" any "other students" an exemption from the dress code, a necessary element of a §1983 claim. *Iqbal*, 556 U.S. at 680-81.

Furthermore, with regard to the first prong of the qualified immunity test, as explained more thoroughly *infra*, Plaintiffs' claims that Larissa's constitutional rights were violated because she was denied permission to participate in the graduation ceremony with religious symbols on her cap fail under §1983. Indeed, the letter from the District to the ACLU and NARF, which Plaintiffs themselves attach to their Amended Complaint, verifies that other students were expressly prohibited from augmenting their graduation

---

otherwise available public benefit on account of its religious status. In addition to not being factually similar to the instant matter, it is not clear that the majority opinion in *Trinity* would be followed in a case outside the general parameters of the facts stated in *Trinity*; Justice Thomas filed an opinion concurring only in part, in which Justice Gorsuch joined; Justice Gorsuch filed an opinion concurring only in part, in which Justice Thomas joined; Justice Breyer filed an opinion concurring in the judgment; and Justice Sotomayor filed a dissenting opinion in which Justice Ginsburg joined. Notably, the "policy" under scrutiny *expressly* discriminated against the church as a religious organization, whereas the dress code involved in this matter was both content and viewpoint neutral. *See Bethel Ministries, Inc. v. Salmon*, 2020 WL 292055, at *9-10 (D. Md. Jan. 21, 2020) ("Here, Bethel has not proven express discrimination on the part of Defendants. Unlike the government in *Trinity Lutheran*, Defendants did not have an express policy of denying funding to schools with religious ties.").

robes and/or caps with religious symbolism, contradicting Plaintiffs' claim that "other students" were granted exemptions from the dress code.[21]

Plaintiffs have not established that, in this concrete and factually defined context, it would have been obvious to all reasonable government actors that enforcing a content and viewpoint-neutral graduation dress code would violate Larissa's federal constitutional rights. Accordingly, all of the individual Defendants are shielded by qualified immunity with regard to Plaintiff's claims for monetary damages against these Defendants acting in their individual capacities. As the claims against the Defendants for declaratory relief are moot, and the claims against them in their official capacities are subsumed by Plaintiffs' claims against the District, and they are shielded by qualified immunity from claims against them in their individual capacities for monetary damages, Plaintiffs' claims against the individual Defendants must be dismissed.

## V. Analysis of Plaintiffs' Claims for Relief

The Court also concludes that Plaintiffs have not adequately pleaded cognizable claims for relief pursuant to §1983.

### A. Free Speech

The First Amendment prohibits laws abridging the freedom of speech. *E.g.*, *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Although students retain significant First Amendment rights in the public school context, *see Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509 (1969), their rights "are not automatically coextensive with [those] of adults in other settings, and must be applied in light of the special

---

[21] We have held that a plaintiff can—as Sprewell has done here—plead himself out of a claim by including unnecessary details contrary to his claims. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir.1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *cf. Soo Line R.R. v. St. Louis Southwestern Ry., Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts.").

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotation marks and citation omitted). *See also Morse v. Frederick*, 551 U.S. 393, 397 (2007); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682-83 (1986) ("*Fraser*") ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 764 (9th Cir. 2006). [22]

---

[22] The federal courts have generally construed the standard stated in *Tinker* as that applied to school regulations directed at students' personal and viewpoint-based speech, and applied the *Tinker* standard to enable schools to limit an individual's expressive speech based on the potential for the speech to cause "disruption." In *Tinker*, school officials suspended students for wearing black armbands to school in protest of the Vietnam War, in violation of a school regulation promulgated by the school district, and the students asserted this violated their rights to free speech. *See* 393 U.S. 503, 508 (1969). The *Tinker* majority held this type of speech, akin to "pure speech," could only be constitutionally prohibited if there was evidence the speech would cause a substantial and material disruption in the school's operation. *Id.* at 509. The majority opinion in *Tinker* does not use the words "compelling," "legitimate," "rational," or "interest." The majority opinion noted the trial court had found the "school authorities' action [constitutional] on the ground that it was reasonable in order to prevent disturbance of school discipline." *Id.* at 505, 508. The majority of Supreme Court justices disagreed with the trial court:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside v. Byars*, *supra*, 363 F.2d at 749.
>
> In the present case, the District Court made no such finding [that allowing the speech would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,"] and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students. Even an official memorandum prepared after the suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption.
>
> On the contrary, the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy which might result from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam

*Id.* at 509-10.

1

2    Justice White's brief concurrence in *Tinker* states: "I deem it appropriate to note, first, that the Court continues to recognize a distinction between communicating by words and communicating by acts or conduct which sufficiently impinges on some *valid* state interest . . ."

3

*Id.* at 515 (emphasis added). Justice Harlan, dissenting, opined:

4    I am reluctant to believe that there is any disagreement between the majority and myself on the proposition that school officials should be accorded the widest authority in maintaining discipline and good order in their institutions. To translate that proposition into a workable constitutional rule, I would, in cases like this, cast upon those complaining the burden of showing that a particular school measure was motivated by other than *legitimate* school concerns—for example, a desire to prohibit the expression of an unpopular point of view, while permitting expression of the dominant opinion.

5

6

7

8

9    *Id.* at 526 (emphasis added).

10    In *Fraser*, the Supreme Court considered a school's content-based regulation of lewd, vulgar, obscene, or plainly offensive speech. *See* 478 U.S. 675 (1986). In *Fraser* school officials suspended a student for delivering a speech containing sexually explicit metaphors at a school assembly. The majority of justices distinguished *Tinker* because the restriction in *Tinker* was based on the precise political viewpoint expressed by the students. *Id.* at 677-79. The *Fraser* majority held lewd on-campus speech could be prohibited because it was "wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685-86. The majority opinion did not use the terms "rational," "reasonable," "legitimate," or "compelling."

11

12

13

14    Justice Blackmun, in his concurrence, stated: "

15    It is true, however, that the State has interests in teaching high school students how to conduct civil and effective public discourse and in avoiding disruption of educational school activities. Thus, the Court holds that under certain circumstances, high school students may properly be reprimanded for giving a speech at a high school assembly which school officials conclude disrupted the school's educational mission. Respondent's speech may well have been protected had he given it in school but under different circumstances, where the school's *legitimate* interests in teaching and maintaining civil public discourse were less weighty.

16

17

18

19

20    In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate respondent's speech because they disagreed with the views he sought to express. . . .

21

22

***

23    Thus, the Court's holding concerns only the authority that school officials have to restrict a high school student's use of disruptive language in a speech given to a high school assembly.

24

25    *Id.* at 688-89 (emphasis added).

26    A third category of speech, and a different level of scrutiny, is represented by *Hazelwood*, which involved regulation of student expression within the context of school-sponsored activities. Utilizing a forum analysis, the Supreme Court concluded the school newspaper was not a "public forum," and held the school could impose "reasonable restrictions" on student speech in the school paper. 484 U.S. 260, 267-71 (1988).

27

28

A school may limit a student's speech without violating the student's First Amendment rights, and the test applied with regard to the permissibility of the limitation requires determining the nature of the forum in which the speech is made. *See Nurre*, 580 F.3d at 1093. "Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999) (internal quotations omitted). A sub-category of the "designated public forum" is the "limited public forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001); *OSU Student All. v. Ray*, 699 F.3d 1053, 1062 (9th Cir. 2012); *Nurre*, 580 F.3d at 1093-94; *Flint v. Dennison*, 488 F.3d 816, 830-31 (9th Cir. 2007).[23] A limited public forum occurs when the government opens a non-

---

The majority opinion in *Hazelwood* concluded:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.
>
> *Educators are entitled to exercise greater control over this second form of student expression* to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Id.* at 270-71 (emphasis added). The holding of *Hazelwood* is summarized in this statement:

> Accordingly, we conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold *that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns*.

*Id.* at 272-73 (emphasis added).

[23] In *Nurre*, the Ninth Circuit noted that:

public forum, such as a school, to certain types of speech. *See OSU Student All.*, 699 F.3d at 1062.

In a limited public forum, the government may regulate speech as long as the regulations: "(1) comport with the definition of the forum (for example, the government cannot exclude election speech from a forum that it has opened specifically for election speech); (2) are reasonable in light of the purpose of the forum; and (3) do not discriminate by viewpoint." *Id.* Additionally, in non-public fora, which includes public property that "is not by tradition or designation a forum for public communication . . .,"such as a school campus, the government may impose time, place, and manner restrictions on speech, and "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). *See also Nurre*, 580 F.3d at 1094. [24]

---

. . . this is not a case involving viewpoint discrimination, which would be impermissible no matter the forum. Nurre concedes that she was not attempting to express any specific religious viewpoint, but that she sought only to "play a pretty piece." *See Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is [viewpoint discrimination]. . . . The government must abstain from regulating speech when the *specific motivating ideology or the opinion or perspective of the speaker* is the rationale for the restriction." (emphases added)).

580 F.3d at 1095 n.6 (emphasis in original). The policy enacted by the Dysart Governing Board was both content and viewpoint neutral, and Plaintiffs were made aware prior to the ceremony that the District had also denied a request from "seminarians" that they be exempted from the dress code.

[24] In *Nurre* the Ninth Circuit Court of Appeals rejected a student's claim that her rights to free speech, free expression of her religion, and due process were violated when the school district required that all musical performances at a graduation ceremony be secular. *See* 580 F.3d 1087 (9th Cir. 2009). The court concluded that, "[e]ven if" a public forum was created, the school district had a legitimate reason for the limitation because it was acting to avoid a repeat of a controversy that had ensued after a religious song had been performed at the prior year's graduation ceremony. The *Nurre* court noted:

Though we considered student speech at graduation in both *Lassonde v. Pleasanton Unified School District*, 320 F.3d 979 (9th Cir.2003), and *Cole v. Oroville Union High School District*, 228 F.3d 1092 (9th Cir. 2000), we did not find those cases appropriate for making a forum determination. Instead, we held there that the dangers of entangling religious speech into a convocation where the

The federal courts that have considered the issue have generally determined that school-sponsored settings, such as a high school graduation ceremony, are non-public or "limited" public forums, and a content-neutral restriction on speech in the forum must be "reasonably related" to a legitimate interest, such as pedagogical concerns. *Hazelwood*, 484 U.S. at 267; *Nurre*, 580 F.3d at 1094, *citing DiLoreto*, 196 F.3d at 965; *DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 78 (2d Cir. 2010); *Campbell v. St. Tammany Par. Sch. Bd.*, 231 F.3d 937, 941 (5th Cir. 2000); *Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207, 214 (2d Cir. 1997); *American Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1478 (3d Cir. 1996); *Spears*, 372 F. Supp. 3d at 910-13;[25] *Griffith*, 157 F. Supp. 3d at 1163; *Dreaming Bear*, 714 F. Supp. 2d at 988-89; *O.T. ex rel. Turton v. Frenchtown Elementary Sch. Dist. Bd. of Educ.*, 465 F. Supp. 2d 369, 379 (D.N.J. 2006) (concluding after-school talent show open

---

audience was essentially captive and composed of impressionable adolescents outweighed the individual's interest in presenting proselytistic speech. *Lassonde*, 320 F.3d at 983; *Cole*, 228 F.3d at 1101. *See also Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 799 (9th Cir. 1999) (en banc) (dismissing for lack of jurisdiction suit against school district for censorship of graduation speech)

580 F.3d at 1094 n.5.

[25] In limited public forums, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009); *see also Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 189 [] (2007) (explaining that restrictions on speech in a non-public forum are permissible if they are "reasonable in light of the purpose served by the forum" and "viewpoint neutral"); *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1105 (9th Cir. 2018) (citations omitted) (In a limited public forum, the "restrictions must be (1) 'reasonable' and (2) 'not an effort to suppress expression merely because public officials oppose the speaker's view.'").

*Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 913 (D. Ariz. 2019).

    A speech restriction is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 [] (1984). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." [*Ward v. Rock Against Racism*, 491 U.S. 781, 791 [] (1989)]. The test is whether the government has adopted the restriction "because of disagreement with the message it conveys." *Id.*

*One World One Family Now v. City & Cty. of Honolulu*, 76 F.3d 1009, 1012 (9th Cir. 1996), *quoted in Spears*, 372 F. Supp. 3d at 914.

to the public was limited public forum); *Adler v. Duval Cty. Sch. Bd.*, 851 F. Supp. 446, 454 (M.D. Fla. 1994) (holding high school graduation ceremony was limited public forum), *aff'd*, 112 F.3d 1475 (11th Cir. 1997). *Compare Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302-04 (concluding "extremely selective access of the policy [regarding invocations at school-sponsored events] and other content restrictions confirm that it is not a content-neutral regulation that creates a limited public forum for the expression of student speech."); *Frudden v. Pilling*, 877 F.3d 821, 833 (9th Cir. 2017).[26]

The reasonableness of restricting speech in a limited public forum is judged "in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 107, *quoted in Agema v. City of Allegan*, 826 F.3d 326, 337 (6th Cir. 2016) (Merritt, J. concurring in part and dissenting in part). A school district may proscribe speech in a limited public forum "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and all the surrounding circumstances." *DiLoreto*, 196 F.3d at 967 (internal quotations omitted), *citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 809 (1985), *and Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), *and Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-

---

[26] *Frudden* is not controlling in this matter, as the dress code at issue in that case (requiring elementary school students to wear a uniform displaying the motto "tomorrow's leaders") did not involve a "limited public forum" and the dress code was not content-neutral. The *Frudden* panel concluded the dress code violated the students' First Amendment rights, *inter alia*, because it allowed an exemption for students to wear the uniforms of nationally recognized youth organizations, such as Boy Scouts and Girl Scouts, on those organization's regular meeting days. The *Frudden* opinion also reveals a disagreement among Ninth Circuit jurists with regard to school dress codes:

> Our three-judge panel disagrees with the three-judge panel that reversed and remanded the district court's decision in *Frudden II*. We believe that intermediate rather than strict scrutiny should be applied to the [] uniform policy. In an attempt to reverse the decision of the first panel, we made a sua sponte en banc call. The call failed to receive a majority vote of the active members of our court.
> Given the failure of our en banc call, we consider ourselves bound by the holding of the prior three-judge panel. So bound, we hold that the uniform policy—both the motto requirement and the exemption—violate the First Amendment. *We further hold that the Individual Defendants are entitled to qualified immunity because the applicable law was not sufficiently clear to put them on notice that the uniform policy would violate the First Amendment*. . . .

*Frudden v. Pilling*, 877 F.3d 821, 824 (9th Cir. 2017) (emphasis added).

93 (1993). Notably, in *Fraser* the Supreme Court reasoned that school boards have the authority to determine "what manner of speech in the classroom *or in school assembly* is inappropriate." 478 U.S. at 683 (emphasis added) (Brennan, J., concurring) ("In the present case, [involving student speed during a high school assembly] school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate [the student's] speech because they disagreed with the views he sought to express."); *Lee v. Weisman*, 505 U.S. 577, 597 (1992) (holding school officials "retain a high degree of control over the precise contents of [a graduation ceremony], the speeches, the timing, the movements, the dress, and the decorum of the students").

Any expressive speech at the Valley Vista High School graduation ceremony was school-sponsored speech, and the District did not violate the "First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1230 (10th Cir. 2009). *See also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 304 (3d Cir. 2013). The purpose served by the forum at issue in this matter, i.e., a high school graduation ceremony, was to "honor the academic achievements of all students" and acknowledge the unity of the students in accomplishing an academic achievement, i.e., completing the academic requirements for graduation. Additionally, as the District's counsel noted in the letters to the ACLU and NARF, the requirement that students not augment their graduation caps was to "preserve the sanctity of the ceremony for graduating students and their families," and "to show respect for the formality of the ceremony, unity for the graduating Class of 2019, and to avoid disruption of the commencement ceremonies that is likely to occur if students are allowed to alter their graduation cap or gown."(ECF No. 7-4 at 3). All of these motives were reasonable in light of the purpose served by the forum, i.e., to commemorate the graduating students' academic achievement. Accordingly, limiting expression to the school's own standards of academic achievement in the form of

sashes or cords indicating such achievement was a reasonable restriction on their attire. Promoting student achievement is an "important interest" which satisfies intermediate scrutiny. *Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 429 (9th Cir. 2008) (holding the government's stated goals of increasing student achievement, promoting safety, and enhancing a positive school environment "unquestionably qualify as 'important'" interests); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391 (6th Cir. 2005) (designating the goals of "bridging socio-economic gaps between families" and "focusing attention upon learning" as "important governmental interests"). Furthermore, adopting an appearance of neutrality with regard to religion or cultural viewpoints, and the avoidance of controversy, have been deemed reasonable bases for subject-matter limitations, such as limitations on religious expression, on a student's free speech rights. *See Nurre*, 580 F.3d at 1093-94. In this matter, all expressive speech, including but not limited to religious speech, was prohibited by the dress code blanketly prohibiting the augmentation of graduation caps, and the restriction was reasonable and related to the purpose of the forum. And, most notably, the prohibition of any adornment of any kind on a student's graduation cap during the commencement ceremonies was content-neutral. *See Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) (noting the subject restriction was "without reference to the content of the regulated speech").

Accordingly, the graduation dress code and the refusal to allow Larissa Waln an exemption from the dress code did not violate her First Amendment right to freedom of speech.

## B. Free Exercise of Religion

Plaintiffs assert:

> . . . Defendants' policy regarding graduation dress discriminated against Larissa's Native American religious beliefs, because Defendants permitted and accommodated secular messages expressed on the graduation attire of some students, including a breast cancer awareness sticker, but denied that accommodation for her religious beliefs. FAC ¶ 101. Plaintiffs have also alleged that Defendants do not have any compelling interest to suppress one student's "silent, non-disruptive expression of religious conviction, while simultaneously permitting other students to express secular

messages on their graduation caps." *Id.* ¶ 102. Larissa was thus deprived of participating in her graduation ceremony, which is a public benefit, because of the religious nature of her graduation cap adornments, which is a violation of her clearly-established rights. *See Trinity Lutheran*, 137 S. Ct. at 2021

\*\*\*

Defendants [sic] reliance on the *Griffith* and *Dreaming Bear* cases is misplaced because neither of these out-of-circuit cases involved allegations of express discrimination based on religious beliefs—i.e., that other students at the graduation were permitted to express secular non-school-related messages on their graduation cap, yet religious expressions were denied.

\*\*\*

Further, these cases were decided before *Trinity*, in which the Supreme Court made clear that discrimination against religious exercise would be subject to the strictest scrutiny. . . .

(ECF No. 37 at 17-19). Plaintiffs also argue Defendants' assertion that they prohibited students from adorning their caps to avoid potential Establishment Clause issues is not valid because Defendants did not make this argument when denying Larissa's requested exemption from the dress code, and Plaintiffs further contend Defendants' reliance on *Lassonde v. Pleasanton Unified School District*, 320 F.3d 979, 984 (9th Cir. 2003), is misplaced. (ECF No. 37 at 19).[27]

The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion. U.S. CONST. amend. I. The First Amendment prohibits the government from compelling affirmation of religious belief (the Establishment Clause), punishing the expression of religious doctrines it believes to be false, imposing special disabilities on the basis of religious views or religious status (the Free Expression Clause), or lending its power to one or the other side in controversies over

---

[27] In *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979 (9th Cir. 2003), the Ninth Circuit Court of Appeals held that a student's free exercise rights were not violated by public school officials' decision requiring the student to delete religious proselytizing comments from their commencement address. Citing *Cole v. Oroville Union High School District*, 228 F.3d 1092, 1096 (9th Cir. 2000), a case it found directly on point, the Ninth Circuit again assumed the graduation was a public or limited public forum, and held the school's limitation on the student's speech was necessary to avoid violating the other students' Establishment Clause rights. *See* 320 F.3d at 983-84 (noting "the school district's 'plenary control over the graduation ceremony, especially student speech'").

1   religious authority or dogma. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1233 (9th
2   Cir. 2020), *cert. denied*, ___ S. Ct. ___, 2020 WL 7132263 (Dec. 7, 2020) (No. 20-62).
3   However, simply put, the freedom to believe is absolute, but the ability to act on one's
4   religious beliefs is not. *Id.* The right to freely exercise one's religion does not "relieve an
5   individual of the obligation to comply with a valid and neutral law of general applicability
6   on the ground that the law proscribes (or prescribes) conduct that [her] religion prescribes
7   (or proscribes)." *Id.* at 1127 (internal quotations and citations omitted). *See also Stormans,*
8   *Inc. v. Selecky*, 586 F.3d 1109, 1127-28 (9th Cir. 2009) ("*Stormans*").

9       Furthermore, "a law that is neutral and of general applicability need not be justified
10  by a compelling governmental interest even if the law has the incidental effect of burdening
11  a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
12  508 U.S. 520, 531 (1993) ("*Lukumi*"). "Neutral rules of general applicability normally do
13  not raise free exercise concerns even if they incidentally burden a particular religious
14  practice or belief. Thus, a law that is both neutral and generally applicable need only be
15  rationally related to a legitimate governmental interest to survive a constitutional
16  challenge." *Corder*, 566 F.3d at 1232 (citation and internal quotation marks omitted). *See*
17  *also Stormans*, 586 F.3d at 1137. [28]

18

19  ---

20  [28] In *Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872, 883-90 (1990), the Supreme Court held that the religious freedom
21  guaranteed by the Free Exercise Clause of the First Amendment does not require
    religious exemptions from facially neutral laws of general applicability. *Smith*
22  altered the then-prevailing standard of *Sherbert v. Verner*, 374 U.S. at 406-07 []
    and *Wisconsin v. Yoder*, 406 U.S. at 220-21, which applied strict scrutiny to laws
23  that had the effect of burdening religious practices. Under *Sherbert* and *Yoder*, a
    substantial burden on religious exercise—even one arising from the application of
24  a religion-neutral, generally applicable law—was unconstitutional unless the
    government could show that the burden was the least restrictive means of furthering
25  a compelling public interest. *Smith* changed that understanding of the free-exercise
    right. The Court held that neutral laws of general applicability need only satisfy the
26  basic test for rationality that applies to all laws; if a law incidentally burdens the
    exercise of religion, the Constitution does not require an exemption. *Smith*, 494
27  U.S. at 878-79 [].
28  *Korte v. Sebelius*, 735 F.3d 654, 671 (7th Cir. 2013).

1    "A law is neutral so long as its object is something other than the infringement or

2    restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*,

3    451 F.3d 643, 649-50 (10th Cir. 2006). *See also Parents for Privacy*, 949 F.3d at 1235. A

4    policy is "generally applicable" provided "it does not make distinctions based on religion."

5    *Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 394

6    (6th Cir. 2014), *vacated on other grounds*, 575 U.S. 981 (2015). *Accord Lukumi*, 508 U.S.

7    at 542-43 (noting a law is not generally applicable "when a legislature decides that the

8    governmental interests it seeks to advance are worthy of being pursued only against

9    conduct with a religious motivation."). For example, "[a] law lacks facial neutrality if it

10   refers to a religious practice without a secular meaning discernable from the language or

11   context." *Lukumi*, 508 U.S. at 533. Besides the text, how the law works in practice supplies

12   "strong evidence of its object." *Id.* at 535. Even if a law is facially neutral, it may

13   nonetheless fail the neutrality test if "[t]he record . . . compels the conclusion that

14   suppression of [a religion or religious practice] was the object of the ordinances." *Id.*

15   at 534, 542.

16       Because the policy at issue, i.e., the commencement dress code regarding the

17   adornment of graduation caps, "make[s] no reference to any religious practice, conduct,

18   belief, or motivation," it is facially neutral. *See Stormans Inc. v. Wiesman*, 794 F.3d 1064,

19   1076 (9th Cir. 2015) ("*Weisman*"). Neither Plaintiffs' Amended Complaint nor the record

20   in this matter plausibly suggest that the graduation dress code was promulgated with the

21   object of suppressing the exercise of religion. Accordingly, the Court concludes the dress

22   code is neutral for the purpose of analyzing Plaintiffs' free exercise claim.

23       The question of general applicability addresses whether a law treats religious

24   observers unequally. *See Lukumi*, 508 U.S. at 542. For example, "inequality results when

25   a legislature decides that the governmental interests it seeks to advance are worthy of being

26   pursued only against conduct with a religious motivation." *Id.* at 542-43. Therefore, a

27   policy is not generally applicable "if its prohibitions substantially under-include non-

28   religiously motivated conduct that might endanger the same governmental interest that the

law is designed to protect." *Parents for Privacy*, 949 F.3d at 1235 (internal quotations omitted). "In other words, if a law pursues the government's interest 'only against conduct motivated by religious belief,' but fails to include in its prohibitions substantial, comparable secular conduct that would similarly threaten the government's interest, then the law is not generally applicable." *Wiesman*, 794 F.3d at 1079, *quoting Lukumi*, 508 U.S. at 545. For example, in *Lukumi*, the Supreme Court concluded the challenged ordinances were not generally applicable because they "pursue[d] the city's governmental interests only against conduct motivated by religious belief" and "fail[ed] to prohibit nonreligious conduct that endanger[ed] these interests in a similar or greater degree than [the prohibited religious ritual] does." *Lukumi*, 508 U.S. at 543.

The graduation dress code itself was content-neutral and, as written, generally applicable. There is no indication in the facts pled by Plaintiffs that the dress code sought to further the District's interests only against religious expression or Native American culture, and the dress code also prohibited secular speech as it was a blanket prohibition on the decoration of graduation caps. Plaintiffs' allegation that "other students" within the District were specifically allowed, by the named individual Defendants, exemptions from the dress code's prohibition against augmenting graduation caps for secular expression is not plausible. Additionally, because the student represented in the photograph provided by Plaintiffs is from a different high school, it is also not plausible that the Valley Vista High School Principal and Assistant Principals who declined to allow Larissa to wear an adorned graduation cap had the power to or in fact granted the photographed student "permission" to wear a cap augmented with a sticker at the Shadow Ridge High School graduation ceremony. Accordingly, the Court also concludes the dress code was generally applicable.

Additionally, a preliminary and essential element of a free exercise claim is whether the plaintiff's exercise of their religion is interfered with at all, i.e., whether the relevant government policy actually burdened a religious practice. *See Parker v. Hurley*, 514 F.3d 87, 99 (1st Cir. 2008), *citing Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990). *See also Lukumi*, 508 U.S. at 523; *Vernon v. City of L.A.*, 27 F.3d 1385,

1393 (9th Cir. 1994); *California Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1225-26 (N.D. Cal. 2017), *aff'd*, 973 F.3d 1010 (9th Cir. 2020) ("*Torlakson*"). A content-neutral regulation may offend the Constitution if it "*unduly* burden[s] the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) (emphasis added). Neutral rules of general applicability do not raise free exercise concerns if they only "incidentally" burden a particular religious practice or belief. *See*, *e.g.*, *Jacobs*, 526 F.3d at 439; *Torlakson*, 267 F. Supp. 3d at 1225-26.[29] A prohibition only incidentally

---

[29] "Under the Free Exercise Clause, a law that burdens religious practice need not be justified by a compelling governmental interest if it is neutral and of general applicability." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 523, 113 S. Ct. 2217 [] (1993) (*citing Smith*, 494 U.S. 872, 110 S. Ct. 1595) (emphasis added). *Smith* did not remove the preliminary requirement that there be a burden on some religious practice. *See id.*; *accord Parker v. Hurley*, 514 F.3d 87, 99 (1st Cir. 2008) (*Smith* "did not alter the standard constitutional threshold question" of "whether the plaintiff's Free Exercise is interfered with at all.").

    The Ninth Circuit has explicitly rejected the argument that after *Smith*, plaintiffs are not required to demonstrate a substantial burden on their exercise of religion. *See Am. Family Ass'n, Inc. v. City & Cty. of S.F.*, 277 F.3d 1114, 1123-24 (9th Cir. 2002). In *American Family Association*, the plaintiff religious group sponsored an advertising campaign espousing the view that homosexuality is a sin, and brought suit when San Francisco adopted a resolution formally denouncing the campaign. *Id.* at 1118-19. The group alleged that the city's disapproval of its message had a chilling effect on its free exercise of religion. *Id.* at 1124. The Ninth Circuit affirmed dismissal for failure to state a claim because "a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden" and the "complaint d[id] not otherwise allege any specific religious conduct that was affected by the Defendants' actions." *Id.*

*California Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1225–26 (N.D. Cal. 2017), *aff'd* 973 F.3d 1010 (9th Cir. 2020). *Compare Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002).

    Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), and its predecessor statute, the Religious Freedom Restoration Act of 1993 ("RFRA"), "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA was enacted three years after the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon. v. Smith*, which held that neutral, generally applicable laws that incidentally burdened the exercise of religion usually did not violate the Free Exercise Clause of the First Amendment. *See Smith*, 494 U.S. 872, 878-82 (1990). *Smith* largely repudiated the method of analysis used in prior free exercise cases like *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963). In those cases, the Supreme Court employed a balancing test that considered whether a challenged government action that substantially burdened the exercise of religion was necessary to further a compelling state interest. *See Yoder*, 406 U.S. at 214; *Sherbert*, 374 U.S. at 403.

burdens a religious practice or belief if the prohibition "conflicts" with a religious belief. *See American Family Ass'n v. City & Cty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002); *Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1534 (9th Cir. 1985) (affirming summary judgment for defendants on a Free Exercise claim based on the plaintiff's objection to an assigned book that offended her religion); *accord Parker*, 514 F.3d at 99 (affirming dismissal of a Free Exercise claim against a school district, finding no burden on a student's religious exercise when student was asked to read a book the plaintiffs found religiously offensive). "[G]overnmental actions that merely offend . . . religious beliefs do not on that account violate free exercise," and an "actual burden on the profession or exercise of religion is required." *Grove*, 753 F.2d at 1543 (Canby, J., concurring).

---

Following the Supreme Court's decision in *Smith*, Congress enacted RFRA to provide greater protection for religious exercise than was available under the First Amendment. *See Burwell*, 573 U.S. at 694. RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b). In making RFRA applicable to the States and their subdivisions, Congress relied on Section 5 of the Fourteenth Amendment, but in *City of Boerne v. Flores* the Supreme Court held that RFRA exceeded Congress' powers under that provision. *See* 521 U.S. 507, 532-36 (1997).

Congress responded to *City of Boerne* by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional authority under the Spending and Commerce Clauses. *See* 42 U.S.C. § 2000cc–1(b). RLUIPA concerns two areas of government activity: Section 2 governs land-use regulation, *see* 42 U.S.C. § 2000cc; and Section 3 governs religious exercise by institutionalized persons, *see* 42 U.S.C. § 2000cc–1. Section 3 mirrors RFRA and provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" "even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). RLUIPA thus allows *prisoners* "to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006). However, the RLUIPA only applies in the contexts of land-use regulation and institutionalized persons and, therefore *Smith* and *Lukumi* remain the prevailing standard in all other contexts. *See Holt v. Hobbs*, 574 U.S. 352, 356-58 (2015). So, unless the plaintiff asserting a free exercise claim implicates a land-use regulation or the plaintiff is an institutionalized person, the plaintiff must establish their religious exercise was burdened, per the holdings in *Smith* and *Lukumi*.

Plaintiffs have not established that the commencement dress code placed more than an incidental burden on a "central religious belief or practice." Plaintiffs do not plausibly allege that Larissa's participation in the graduation ceremony in an unadorned graduation cap would violate a central religious belief, i.e., that doing so would have compelled "a violation of conscience" or required her to engage in a behavior proscribed by her religious faith. *Thomas v. Review Bd. of Indiana Emp't Div.*, 450 U.S. 707, 717 (1981). In order to demonstrate a violation of the Free Exercise Clause, "a litigant must show that challenged state action has a coercive effect that operates against the litigant's practice of his or her religion." *Grove*, 753 F.2d at 1533.

Notably, a public high school graduation ceremony is a secular, government-controlled activity. Larissa's participation in the event did not transform it into a religious event; Plaintiffs' allegation that the event was similar to a bar mitzvah or a Christian confirmation (ECF No. 7 at 11) does not establish her free exercise claim, as a bar mitzvah and a Christian confirmation are religious-themed events while the graduation ceremony was a secular, government-sponsored activity solely for the purpose of acknowledging a non-religious accomplishment, i.e., each student's completion of a government-mandated curriculum for graduation from high school. Although Larissa had a sincere desire to wear her adorned cap to honor her culture and religion and thus increase the spirituality, fervor, and spiritual satisfaction derived from the public high school graduation ceremony, the diminishment of Plaintiffs' "subjective, emotional religious experience," i.e., the diminishment of their spiritual fulfillment in the course of a public-school secular activity, was at best only an incidental burden on the free exercise of her religion. *See Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (applying the Religious Freedom Restoration Act's "substantial burden" analysis).

Plaintiffs' Amended Complaint reflects the importance of Larissa's culture and heritage and her sincere desire to express and affirm her culture and heritage at her graduation. However, the Amended Complaint does not demonstrate that wearing a beaded cap adorned with an eagle feather to a public high school graduation ceremony was an

actual "practice" of Larissa Waln's religion. Larissa was not prohibited from participating in her graduation ceremony, she was advised she could not participate in the ceremony wearing an augmented graduation cap. And although wearing a beaded cap adorned with an eagle feather, which feathers hold special significance for Native Americans, would have been an acknowledgement of Larissa's faith and cultural heritage, she does not allege "any specific *religious conduct* that was affected by the Defendants' actions." *Torlakson*, 267 F. Supp. 3d at 1226 (emphasis added). Accordingly, Plaintiffs have not alleged interference with Larissa's actual exercise of her religion under the Constitution.

The Court weighs heavily Larissa Waln's desire to honor her Native American heritage by displaying symbols of her religious faith and demonstrating the tremendous importance of eagle feathers to her culture at her high school graduation, a solemn and joyous occasion to be celebrated as achievement of an academic goal. However, "the Free Exercise clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (internal quotations omitted). The Constitution does not compel "'teachers, parents, and elected school officials to surrender control of the American public school system to public school students.'" *Fraser*, 478 U.S. at 686, *quoting Tinker*, 393 U.S. at 526.

Because the dress code was content-neutral and generally applicable, and enforcement of the dress code did not more than incidentally burden the free exercise of her religion, the dress code and its implementation did not violate Larissa Waln's free exercise rights.

### C.      Equal Protection

Plaintiffs allege:

132. Plaintiff Larissa Waln was similarly situated in all relevant respects to other graduating high school students in the Dysart School District.
133. Other similarly situated high school graduates from Dysart School District were allowed to walk in their high school graduation ceremonies, even though their caps were adorned with accoutrements expressing a particular point of view, though not the views of a minority religious group.

134. Based on information and belief, other similarly-situated graduates from Dysart School District were *allowed* to wear *non-approved attire* at their high school graduation ceremonies, including in the same building on the same day as Plaintiff Larissa Waln's graduation.

135. Moreover, high school students from other schools in Arizona have been permitted to wear traditionally-beaded graduation caps or eagle feathers or eagle plumes to their high school graduation ceremonies, to denote their religious and cultural beliefs.

136. The Individual Defendants' decision to forbid Plaintiff Larissa Waln *alone* from exercising her First Amendment rights constituted intentional, invidious discrimination against her because of her religious beliefs. The Individual Defendants can have no compelling reason that would justify their banning Plaintiff Larissa Waln's religious dress.

\*\*\*

138. The Individual Defendants acted irrationally and arbitrarily in denying Plaintiff Larissa Waln the right to wear tribal regalia that carried enormous religious and cultural significance. That their decision was not reasonably related to any purportedly legitimate state interest is, again, amply demonstrated by *the liberal concessions that the Individual Defendants provided to other students, who made additions to their caps (including an oversized breast cancer awareness sticker) of a non-religious nature, yet were permitted to walk in their ceremonies.*

(ECF No. 7 at 31-34) (emphasis added).

The Court again notes that Plaintiffs only allege facts to support that one student attending a Dysart graduation ceremony appears in a photograph wearing, after the conclusion of the commencement ceremony, a graduation cap with a sticker of some kind. Furthermore, attached to Plaintiffs' Amended Complaint is a letter affirming that other Dysart students were prohibited from adorning their graduation robes with religious symbols. And, as previously noted, the content of the photograph embedded in the Amended Complaint does not plausibly support Plaintiffs' factual allegation that one or more of the individual Defendants named in this matter specifically permitted or allowed any student to augment their graduation cap in violation of the dress code. Furthermore, "high school students from other schools in Arizona" (ECF No. 7 at 32) are not similarly situated to Larissa, as they were not subjected to the same commencement dress code

applicable to Larissa and, allegedly, all other Dysart School District high school graduates in 2019.

The graduation dress code implicated in this matter was facially neutral, i.e., it prohibited all Dysart graduating students from embellishing their graduation caps in any fashion for any reason. Accordingly, the gravamen of the subject equal protection claim is that Larissa was denied permission to add to her cap because she wished to do so for religious reasons, while the "Individual Defendants" allowed "other students" exemptions from the dress code for "non-religious" expressive speech. The Court again notes that the District's counsel informed Plaintiffs, the ACLU, and NARF that "seminary students" were denied an exemption from the dress code per their request that they "be allowed to wear a special adornment on their gown during the graduation ceremony." (ECF No. 7-4 at 2-3).

Plaintiffs were informed that the purpose of the dress code was to "preserve the sanctity of the ceremony for graduating students and their families and honor the achievements of all students," and

> to show respect for the formality of the ceremony, unity for the graduating Class of 2019, and to avoid disruption of the commencement ceremonies that is likely to occur if students are allowed to alter their graduation cap or gown.

(ECF No. 7-2 at 3-4; ECF No. 7-4 at 2-3). Plaintiffs were further informed: "The commencement dress code is reasonably related to [a] pedagogical concern to avoid controversy that may arise if each student was allowed to adorn or alter his or her graduation attire with religious, cultural or familial emblems or symbols." (ECF No. 7-2 at 4; ECF No. 7-4 at 3).

To state a claim under § 1983 and the Equal Protection Clause, Plaintiffs' Amended Complaint must allege facts showing that Defendants, acting under color of law, deprived Larissa Waln of equal protection of the laws. *See Azer v. Connell*, 306 F.3d 930, 935 (9th Cir. 2002). An equal protection violation occurs when the named defendant's actions were demonstrably motivated by discriminatory intent. *See City of Memphis v. Greene*, 451 U.S. 100, 119 (1981) ("[T]he absence of proof of discriminatory intent forecloses any claim that

the official action challenged in this case violates the Equal Protection Clause of the Fourteenth Amendment"). "Equal protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006). Instead, the Equal Protection Clause requires government entities to treat similarly situated people alike. *E.g.*, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). Equal protection claims can be divided into three general categories: (1) claims that a statute, regulation, or official policy discriminates on its face; (2) claims that the application of a facially neutral statute, regulation, or official policy intentionally has a disparate impact on a particular class; and (3) claims that a facially neutral statute, regulation, or official policy is being unequally administered. *See Hunter v. Underwood*, 471 U.S. 222, 223 (1985) ("*Underwood*") (holding portion of the Alabama state constitution disenfranchising persons convicted of crimes involving moral turpitude violated Equal Protection Clause because although the state was racially neutral its enactment was motivated by a desire to discriminate against blacks on account of race); *Loving v. Virginia*, 388 U.S. 1, 11-12 (1967) (holding miscegenation statutes adopted by the State of Virginia to prevent marriages between persons solely on the basis of their racial classification violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment); *Yick Wo Lee v. Hopkins*, 118 U.S. 356, 373-74 (1886) (holding city ordinances allowing supervisors unfettered discretion to enforce facially neutral regulations solely against Chinese individuals violated Equal Protection Clause). *See also E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987); *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 862 (D. Ariz. 2015), *vacated and reversed in part*, 821 F.3d 1098 (9th Cir. 2016). The third category, applicable in this matter, is sometimes referred to as a "class of one equal protection claim." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also Corales v. Bennett*, 567 F.3d 554, 567-68 (9th Cir. 2009) (finding enforcement of a middle school's content-neutral truancy policy did not violate the equal

1   protection rights of "Mexican-American" students who left campus without authorization

2   to participate in a protest).

3        To properly state a selective enforcement equal protection claim, a plaintiff must

4   allege facts supporting a conclusion that the defendant applied a content-neutral regulation

5   to the plaintiff differently than it applied the regulation to similarly situated individuals,

6   and that the difference in application was intentional and unreasonable. *See Engquist v.*

7   *Oregon Dep't of Agric.*, 553 U.S. 591, 601 (2008); *Snowden v. Hughes*, 321 U.S. 1, 8

8   (1944); *E&T Realty*, 830 F.2d at 1112; *Planned Parenthood of the Great Nw. & the*

9   *Hawaiian Islands v. Wasden*, 406 F. Supp. 3d 922, 931 (D. Idaho 2019); *Griego v. City of*

10  *Albuquerque*, 100 F. Supp. 3d 1192, 1230 (D.N.M. 2015). *Cf. Rubin v. City of Santa*

11  *Monica*, 308 F.3d 1008, 1019 (9th Cir. 2002) ("[R]ational basis review is appropriate

12  unless the restriction unconstitutionally burdens a fundamental right, here, the right to free

13  speech. Because we conclude that the restrictions do not unconstitutionally burden Rubin's

14  right of free speech, we find that neither do they violate his Equal Protection right."); *M.B.*

15  *ex rel. Martin v. Liverpool Cent. Sch. Dist.*, 487 F. Supp. 2d 117, 147 (N.D.N.Y. 2007)

16  (holding a student's equal protection right was not violated by school district's application

17  of a content-neutral policy regulating the distribution of written materials to students,

18  which application prohibited a fourth grader's distribution of a "personal statement" flyer

19  regarding the student's religious beliefs to selected friends and classmates, absent a

20  showing that the student was similarly situated to others who were not required to comply

21  with district policy). Accordingly, "absent proof that [the] defendant [] acted with

22  discriminatory intent," there can be no equal protection violation where the theory of

23  liability is that the defendant unequally administered a facially neutral law. *E&T Realty*,

24  830 F.2d at 1113; *Rock for Life-UMBC v. Hrabowski*, 643 F. Supp. 2d 729, 749 (D. Md.

25  2009), *aff'd*, 411 F. App'x 541 (4th Cir. 2010). When determining if a regulation was

26  applied differently to individuals who are "similarly situated," the analysis must focus on

27  factors of similarity and distinction pertinent to the challenged policy, not factors outside

28

the realm of the policy's concern. *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017).

Therefore, because the dress code was content-neutral, to state a claim for violation of Larissa's right to equal protection Plaintiffs must plausibly allege Defendants applied the provisions of the dress code to her in an intentionally discriminatory manner or that the purportedly selective enforcement of the dress code was motivated by a discriminatory animus. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227-29 (1995); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (holding an equal protection inquiry will only proceed if "there is *proof* that a *discriminatory* purpose has been a *motivating* factor in the decision." (emphasis added));; *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). "Discriminatory purpose" implies more than intent as volition or awareness of consequences. *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.25 (1979) ("*Feeney*"); *United Jewish Org. v. Carey*, 430 U.S. 144, 179 (1977) (Stewart, J., concurring), *both cited in Griego*, 100 F. Supp. 3d at 1230. Discriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part "*because* of," not merely "*in spite* of," its adverse effects upon an identifiable group. *Feeney*, 442 U.S. at 279 (emphasis added). Only if a discriminatory purpose as a motivating factor in the promulgation of the regulation is established, and the discriminatory purpose works against a "vulnerable class," does the reviewing court apply an additional level of scrutiny to the regulation. *Puente Arizona v. Arpaio*, 2016 WL 6873294, at *19 (D. Ariz. Nov. 22, 2016). A statute or regulation does not provoke "strict judicial scrutiny" unless it actually interferes with a "fundamental right" or discriminates against a "suspect class;" if it does not provoke strict scrutiny by those means, a statute or regulation will survive an equal protection attack if the challenged classification was rationally related to a legitimate governmental purpose. *See, e.g.*, *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988); *Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 370

1   (1988); *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982); *San Antonio Indep. Sch. Dist. v.*

2   *Rodriguez*, 411 U.S. 1, 16-17 (1973).

3          The Supreme Court has instructed the federal trial courts to exercise caution when

4   deciding whether a statute or regulation was enacted for a discriminatory purpose. "Proving

5   the motivation behind official action is often a problematic undertaking." *Underwood*, 471

6   U.S. at 228. The task "demands a sensitive inquiry into such circumstantial and direct

7   evidence of intent as may be available." *Village of Arlington Heights*, 429 U.S. at 266,

8   *cited in Puente Arizona*, 2016 WL 6873294, at *16-17.[30] The record also establishes that

9   the dress code was, on its face, a neutral "law" of general applicability; the dress code's

10  provision prohibiting any adornment of a graduation cap, as written, does not contemplate

11  its selective application to certain individuals on the basis of any distinguishing factor.

12         Although Plaintiffs have alleged that Larissa Waln was unjustly denied a religious

13  exemption from a content-neutral dress code, Plaintiffs have not plausibly alleged that any

14  of her fellow District graduates applied for a religious exemption and were granted that

15  exemption (indeed the information attached to the Amended Complaint indicates a group

16  of students who applied for an exemption from the dress code for religious expression were

17  denied). Nor have Plaintiffs plausibly alleged that any student covered by the District's

18  graduation dress code was expressly granted an exemption from the dress code *by any*

19  *named individual Defendant*. Accordingly, there can be no equal protection argument

20  relating to inconsistent enforcement of the dress code in relation to Larissa Waln's sought-

21

22        [30] In *Puente*, the Ninth Circuit remanded the case to the District Court because it disagreed

23  that the subject state criminal laws were preempted by federal law. On remand, the District Court
    concluded the subject state statutes regarding identity theft in the context of employment were

24  facially applied to all individuals, including but not limited to a suspect class, and that Arizona's
    facially-neutral identity theft laws were amended to apply to employment in part because of the

25  effect on unauthorized aliens, i.e., it found the legislature had "dual motives" in enacting the
    statutes. *Puente Arizona v. Arpaio*, 2016 WL 6873294, at *18 (D. Ariz. Nov. 22, 2016).

26  Accordingly, because the laws discriminated against a "suspect class" the court applied strict
    scrutiny, but ultimately determined the legislature was also addressing a pressing criminal problem

27  that adversely affected Arizona residents, so the laws survived an equal protection challenge.

28

after religion-based exemption. *See Jacobs v. Clark Cty. Sch. Dist.*, 373 F. Supp. 2d 1162, 1190 (D. Nev. 2005), *aff'd*, 526 F.3d 419 (9th Cir. 2008).

Plaintiffs have not alleged facts indicating that the dress code, or the District's refusal to allow Larissa Waln an exemption from the dress code, was motivated by discriminatory animus. Nor have Plaintiffs established the promulgation of the dress code and application of the dress code to Larissa violated any of her fundamental rights. Accordingly, the Defendants' actions in promulgating the dress code and requiring Larissa to abide by the dress code is subject to rational basis review, i.e., the restrictions in the dress code must have been rationally related to a legitimate government interest to survive an equal protection challenge. *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) ("we will not overturn [a statute that does not burden a suspect class] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational").

As the Court noted *supra* in the context of Plaintiffs' free exercise claim, Defendants have asserted, and the record supports, that the graduation dress code was rationally based on promoting class unity, honoring academic achievement, conveying the proper solemnity regarding the occasion, and avoiding any disruption that might occur if the students were allowed to decorate their graduation caps to display a personal, familial, religious, or affiliation-related symbol.

Given the facts alleged by Plaintiffs in the Amended Complaint, Plaintiffs do not plausibly allege Larissa Waln's right to equal protection was violated by the promulgation of the dress code or the denial of her requested exemption from the dress code.

## VI.   Leave to Amend

Although leave to amend should be liberally granted if the operative complaint can be saved by amendment, Plaintiffs have not shown in their briefing how they could amend their claims to remedy the Amended Complaint's legal deficiencies with regard to stating

an adequate free speech, free expression, or equal protection claim under the appropriate standard of review, or to correct the primary deficiency with all of their claims, i.e., that an identifiable Dysart graduating senior was given leave by one of the named individual Defendants, acting in their official capacity, to augment their graduation cap. The failure of Plaintiffs' Amended Complaint includes both the insufficiency of a plausible critical factual allegation and the failure of their factual allegations to state a claim for relief under the appropriate standard of scrutiny, which is not strict scrutiny as Plaintiffs contend. Amending their claims will not change, for example, the extent of the rights that are protected by the free speech, free expression, or equal protection provisions of the United States Constitution.

The Court's ruling does not question Larissa Waln's religious and cultural heritage or her disappointment that she was not allowed to participate in her graduation ceremony wearing tribal regalia. The Court's ruling reflects well-established law and precedent in finding that she was not denied a constitutional right redressable by means of a § 1983 action.

Accordingly,

**IT IS ORDERED that** Defendants' motion to dismiss at ECF 29 is **granted** and Plaintiff's §1983 claims, i.e., Counts One, Two, and Three of the Amended Complaint are **dismissed with prejudice.**

**IT IS FURTHER ORDERED that** Plaintiffs' state-law-based claims, i.e., Counts Four and Five are **dismissed without prejudice**, and Plaintiffs may proceed on those claims in state court.

**IT IS FURTHER ORDERED that** the relief sought in the stipulation at ECF No. 47 is **denied as moot**.

Dated this 28th day of February, 2021.

Camille D. Bibles
United States Magistrate Judge